IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED

JAN 9 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 1:12mj18 |
| v. | ) | |
| | ) | |
| BRETT A. AMENDOLA, | ) | |
| | ) | |
| Defendant | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, John S. Posusney, being duly sworn, say:

### INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation.  I have been employed as a Special Agent for nine years, and my current duties include the full time investigation of white-collar crimes.  As such, I have participated in numerous investigations involving bank fraud, conspiracy, mail fraud, wire fraud, securities fraud, and money laundering. I have also received training in the area of white-collar crimes.  Prior to my employment with the FBI, I worked for approximately five years as an auditor in a large public accounting firm.  I am a Certified Public Accountant (CPA) and Certified in Financial Forensics (CFF).

2.      I have participated in the investigation of this offense.  The facts and information contained in this affidavit are based upon my personal knowledge of the investigation, information obtained from other law enforcement officers, and information obtained from interviews and analysis of records.  Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements.

3.     This affidavit is made in support of a criminal complaint charging Brett Anthony Amendola with devising and executing a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses by use of interstate wires, in violation of 18 U.S.C. § 1343.

4.     This affidavit does not contain every detail of every aspect of this investigation, but rather sets forth those facts that I believe are necessary to demonstrate probable cause for the criminal complaint and for Amendola's arrest.

STATEMENT OF PROBABLE CAUSE

*Summary*

5.     Various investors have told the FBI that they agreed to provide short-term funding to Amendola, who had told them that he was attempting to purchase a golf course in Loudoun County, Virginia.  Amendola explained to the investors that he was looking for short-term funding to be placed in an escrow account controlled by an attorney in Reston, Virginia (hereafter referred to as the Escrow Attorney) to show Amendola's supposed lender for the purchase of the golf course, Incite Financial, that he had capital.  The money was to be returned in five days. Instead, however, Amendola diverted the investors' funds to his own use by posing as the Escrow Attorney in email messages and telephone calls with the investors, thereby leading the investors to wire the funds to an account controlled by Amendola, not the Escrow Attorney. Other investors have recounted to the FBI similar misrepresentations made by Amendola to induce them to wire funds to accounts controlled by Amendola.

-2-

*Beacon Hill Golf Course*

6.      On August 8, 2011, I interviewed an attorney representing Senior Tour Players Fund I LP (STP), the owner of the Beacon Hill Golf Course. STP wanted to sell the course, and in approximately 2010, there was a "live" contract with Capital Golf Partners to purchase the golf course for $3.5 million. Brett Amendola was the business contact for Capital Golf Partners. Amendola was going to place $3.5 million into an escrow account held by Old Dominion Settlements, d/b/a Key Title, located in Reston, Virginia, to purchase the golf course. The contract lapsed, however, because Amendola did not obtain funding for the purchase of the golf course.

7.      I reviewed records of the Virginia State Corporation Commission (VSCC) and noted that Capitol Golf Partners, LLC, was registered by Amendola. The principal office address is on Dry Mill Road in Leesburg, Virginia, at a prior residence for Amendola.

8.      In December 2011, the Loudoun County Sheriff's Office interviewed the president of the Beacon Hill Golf Course Home Owners' Association (HOA). The HOA president said that since 2005 the golf course has been closed and up for sale. The president said that in the last two years there has been no effort on the part of STP, the owner of the golf course, to sell the course, and from what he has been told there have been no offers to purchase the course. The president said that he had been told by an attorney representing STP that in approximately early 2009 Amendola approached STP with an interest in purchasing the course and that STP had required Amendola to put $3.5 million into an escrow account before it would entertain an offer. To date, neither STP nor the attorney had seen any funds in escrow, and since 2009 neither has had any dealings with Amendola. The HOA president said that the current value of the entire

-3-

course, based upon the land value, was about $1 million.  However, to bring the course up to standards for play would cost approximately $5 million to $6 million.  The HOA president said that, from his understanding, STP would entertain any serious offer to purchase the course.

*Investor #1*

9.       Investor #1 is a managing partner of Tempo Funding LLC.  In June 2011, the FBI received a complaint from Investor #1, who said that he had provided $350,000 in short-term funding for Amendola.  I interviewed Investor #1 on June 5, 2011, who explained that his company provided short-term funding to businesses.  Investor #1 was presented an offer to provide short-term funding to Amendola and in return would receive a ten percent fee of $35,000.

10.      According to Investor #1, he spoke to Amendola on approximately May 24, 2011. Amendola told Investor #1 that he was attempting to purchase Beacon Hill Golf Course in Loudoun County, Virginia.  Amendola said that he was looking for $1.5 million in short-term funding to be placed in an escrow account controlled by an escrow attorney, who was located in Reston, Virgina, to show Amendola's lender that he had capital.  The money placed in escrow was to be returned in five days.  Amendola further explained that he was attempting to obtain a $3.5 million loan from his lender to fully fund the purchase of the golf course.  Amendola was then going to "flip" the golf course and sell it to a Japanese company for more than $5 million. Amendola offered to pay a fee of ten percent of any money loaned to the escrow account by Investor #1.  Investor #1 tentatively agreed to lend $350,000 based on the outcome of his due diligence work.

-4-

11.     Investor #1 also spoke with the Escrow Attorney who represented that he was an attorney for Old Dominion Settlements, d/b/a Key Title, the escrow company in Reston, Virginia. The Escrow Attorney subsequently provided Investor #1 with a document showing his lawyer's professional liability insurance policy. The Escrow Attorney also provided his company's insurance policy. The Escrow Attorney represented to Investor #1 that he had known Amendola for years.

12.     Investor #1's staff independently verified the Escrow Attorney's credentials by going to the Virginia Bar Association's website and noting that the Escrow Attorney was in good standing. An Internet search for Old Dominion Settlements, d/b/a Key Title listed the address and phone number as the same as the information provided by Amendola. The Internet search also identified the Escrow Attorney as an employee for Old Dominion Settlements, d/b/a Key Title. Through review of records of the VSCC, Investor #1's staff noted that Old Dominion Settlements, d/b/a Key Title was in good standing. Investor #1's staff also independently verified the insurance policies provided by the Escrow Attorney by directly contacting the insurance companies.

13.     On approximately May 25, 2011, Investor #1 spoke by telephone with Amendola and the Escrow Attorney, who were both at the Escrow Attorney's office. Both Amendola and the Escrow Attorney stated that the money loaned by Investor #1 was not going to be used as a down payment. Any money loaned would be safe and secure in the escrow account. Amendola, the Escrow Attorney, and Investor #1 subsequently signed an agreement to fund an escrow account in control of the Escrow Attorney with $350,000. Under the agreement, the funds would

be held in the escrow account for five business days. Investor #1 would receive a $35,000 fee, to be disbursed by the Escrow Attorney.

14.     On May 25, 2011, Investor #1 received an email from the Escrow Attorney's email address directing Investor #1 to wire the funds to Wachovia Bank. Shortly after the email, Amendola told Investor #1 that the Escrow Attorney might want the funds sent to another bank account. To confirm the wire instructions, Investor #1 sent an email to the Escrow Attorney to confirm that he wanted the money wired to Wachovia Bank. At approximately 2:25 pm, Investor #1 received an email from the Escrow Attorney's email address directing Investor #1 to wire the funds to what was represented to be the escrow company's account at M&T Bank with an account number ending in 1625 ("the M&T Bank account"). Believing the email was from the Escrow Attorney, Investor #1 wired $350,000 to this account. Investor #1 wired the $350,000 from his company's bank account located in San Francisco, California.

15.     According to M&T Bank records, on November 1, 2010, the M&T Bank account was opened by Amendola in the name of Old Dominion Settlements & Escrow, 43605 Solheim Cup Terrace, Ashburn, Virginia. The account opening document listed Amendola as the president of Old Dominion Settlements & Escrow. The account is located at an M&T Bank branch in the Eastern District of Virginia.

16.     At approximately 3:13 pm, on May 25, 2011, Investor #1 advised the Escrow Attorney by email that he sent the wire to him. The Escrow Attorney's reply email told Investor #1 that he would alert his staff to verify the receipt. About an hour later, Investor #1 called the Escrow Attorney to confirm that he had received the wire; however, the Escrow Attorney stated that he did not receive any money and that his company banked at Wachovia Bank. The Escrow

-6-

Attorney stated that he did not send an email instructing Investor #1 to wire the money to an M&T Bank account. The Escrow Attorney also told Investor #1 that he allowed Amendola to use his computer while he was in a meeting, and speculated that Amendola may have sent the email, and then deleted it, since the Escrow Attorney did not have a record of the email with wiring instructions to M&T Bank.

17.    After hearing the Escrow Attorney say he did not bank at M&T Bank, Investor #1 contacted his bank to have the wire reversed; however the funds had already been transferred from the M&T Bank account to another account. Investor #1 subsequently contacted an M&T Bank investigator who confirmed that a $350,000 wire was deposited in the account, and then a wire for $347,000 went out of the account. Investor #1 called Amendola to find out where the $350,000 went. Amendola told Investor #1 that there must have been a mistake and that he would have the wire reversed.

18.    I reviewed email correspondence obtained from Investor #1 and noted that on May 25, 2011, at approximately 11:32 a.m., Investor #1 wrote to the Escrow Attorney and copied Amendola, "[Escrow Attorney] - could you send me your wiring instructions." On May 25, 2011, at approximately 12:52 p.m., Amendola wrote to the Escrow Attorney, "Already had sent them full package. I'll take over from here. I'm working directly w [Investor #1]. Thanks [Escrow Attorney]!" At approximately 2:03 p.m., Investor #1 wrote an email to the Escrow Attorney and Amendola, "[Escrow Attorney] - do I wire to the account that you sent me at: Wachovia Bank, N.A., Roanoke, Virginia 24011, ABA# 051 400 549, Old Dominion Settlements t/a Key Title and account number [ending in 1927]. Brett is saying that you might want the funds in another bank account. Please confirm." At approximately 2:25 p.m., Investor

#1 received an email with an attachment from the Escrow Attorney's email account stating, "Please send to our escrow account at M&T Bank. See attached." I reviewed the attachment and noted that the wiring instructions were to the M&T Bank account.

19.     From my review of the May 2011 statement for the M&T Bank account, I noted an incoming Fedwire Funds Transfer of $350,000 from Investor #1 on May 25, 2011. I also noted on the bank statement a $347,000 outgoing Fedwire Funds Transfer to RMA Capital, LLC (RMA Capital). According to the VSCC, RMA Capital's registered agent is Amendola's father, Roger Amendola.

20.     I reviewed the wire detail of the outgoing $347,000 and noted that it was wired to a Bank of America account ending in 6334 in the name of RMA Capital ("the RMA Capital BOA account"). I reviewed statements for the RMA Capital BOA account and noted that shortly after the account received the $347,000 wire from the M&T Bank account, withdraws totaling approximately $348,000 were made. From my review of the May 2011 statement for the RMA Capital BOA account, I noted that on May 25, 2011, $25,000 was wire transferred to Investor #5 (discussed below) who had previously wired $500,000 to Amendola; on May 26, 2011, $63,000 was wired to an investor I interviewed on November 7, 2011, who stated that he provided money to Amendola to purchase the golf course, but that Amendola was paying him back; on May 26, 2011, two wire transfers totaling $225,000 were made to Roger Amendola's E-trade account; on May 27, 2011, four withdraws were made to Charles Town Races, a casino and race track located

in West Virginia, totaling approximately $28,000; and on May 31, 2011, $7,500 in cash was withdrawn.[1]

21.     I reviewed a recorded call between Investor #1 and Amendola that occurred on June 8, 2011.[2] During the call Investor #1 asked Amendola, "You had me send the money to M&T Bank?  Then you send the money to what, Incite Financial?"  Amendola answered, "Correct . . . It was two payments.  It was the money we were short to close because the funds we needed, you know; [then] we had a couple of other investors put money in as well."  Investor #1 then asked, "Why did you need to have wire to M&T Bank instead of [the Escrow Attorney]'s account at the Wachovia when you could have had the money then and they would have verified the money there?"  Amendola answered, "It needed to be moved to their account and we couldn't do that."  Investor #1 then asked, "Why did you not tell me up front that you have me wire the money to this account, which is not [the Escrow Attorney]'s account and then you are going to send it over to this hard money lender?"  Amendola answered, "You will never understand this.  I am mad that I did it too.  I mean now I am, but for eighteen months I worked on this project.  I spent my whole life, my life savings to get this thing to the closing table."

22.     I reviewed a recorded call between Investor #1 and Amendola that occurred on June 17, 2011.  During the call Investor #1 asked Amendola, "Why did you take it in the first place?  Why didn't you tell me when you were going to use the money for something else other than verification of a deposit?"  Amendola answered, "Because I didn't know, the deal was

---

[1]Investor #1 said that he later received two wires from Amendola returning approximately $135,000.

[2]The conversations are presented without editing, except where indicated.

changing the entire time I was working on it, the transaction kept changing.  So I didn't know until the very end that they were going to require us to put the money down versus having just be verified."  Investor #1 then asked, "Remember you send the wiring instructions and I want [the Escrow Attorney] to verify and I sent him an email.  And then an email came back from him.  Did you send email or did he send with the wiring instructions to M&T Bank?"  Amendola answered, "I did that . . . . He had nothing to do with that.  I was working at his office."

23.     On June 23, 2011, I interviewed the Escrow Attorney in Reston, Virginia.  According to the Escrow Attorney, approximately two years ago, Amendola told the Escrow Attorney that he was trying to purchase Beacon Hill Golf Course.  Amendola asked the Escrow Attorney if he could run a title search on the property and set up an escrow account to hold money for the purchase of the golf course.  The Escrow Attorney understood from Amendola that Amendola was going to buy the golf course by having Amendola's partnership, Capital Golf Partners, LLC, obtain a $3.5 million loan  The money was to be placed in the Escrow Attorney's company escrow account.  After receiving the approval of all the parties, the money would be released to the seller of the golf course in exchange for the deed to the golf course.

24.     According to the Escrow Attorney, in May 2011, Investor #1 agreed to advance monies to one of Amendola's business, Alexson or RMA Capital, so that Amendola could pay a ten percent fee for the purchase of the golf course.  The Escrow Attorney wrote up an escrow agreement in which Investor #1 would advance $350,000 to Escrow Attorney's company escrow account on May 25, 2011.  After a period of time, the money was to be returned to Investor #1 or sent to a destination as instructed by Investor #1.

-10-

25.     The Escrow Attorney said that on May 25, 2011, Amendola came to the Escrow Attorney's office to "manage other aspects" of the purchase of golf course.  Amendola did not have an appointment with the Escrow Attorney.  While at the Escrow Attorney's office, Amendola asked if he could use the Internet to access his email.  The Escrow Attorney took Amendola to a conference room, adjacent to the Escrow Attorney's office, which had a computer terminal.  The Escrow Attorney logged onto the computer for Amendola to use, then went to another conference room to be the notary for a will signing.  Amendola left the Escrow Attorney's office prior to the Escrow Attorney completing the will signing.

26.     Later the same day, according to the Escrow Attorney, Investor #1 emailed him asking if he received the $350,000 wire.  The Escrow Attorney responded that he did not receive the wire.  Investor #1 later called and told him that he wired the money to M&T Bank.  The Escrow Attorney informed Investor #1 that his company only banks at Wachovia Bank.

27.     On June 23, 2011, I reviewed an email sent to me by the Escrow Attorney forwarding an email he had received from Amendola on May 27, 2011.  In the email, Amendola wrote to the Escrow Attorney, "As it pertains to how the wiring instructions got to [Investor #1] from your computer, I sent the email from your computer.  While you were in a closing, I was in the back office preparing paperwork for the transaction.  I emailed you the instructions, opened the attachment, and attached the document to the outgoing email from your computer.  Lastly, I deleted the emails."

28.     On September 23, 2011, Apptix, Inc, provided a CD with emails for bamendola@alexsoninc.com in response to a search warrant for the email account.  I reviewed

the emails and noted that the email provided by the Escrow Attorney referenced in the paragraph above was provided in the records received from Apptix, Inc.

*Investor #2*

29.     Investor #2 is the owner of Legacy Real Estate Solutions.  On June 30, 2011, I interviewed Investor #2, who explained that his company provided short-term funding to businesses.  A third-party company presented an offer to Investor #2 to provide $700,000 in short-term funding to Amendola for a three and one-half percent fee.  According to Investor #2, he spoke with Amendola, someone purporting to be the Escrow Attorney, and Amendola's supposed lender.  During the call, Amendola told Investor #2 that his company, Capital Golf Partners, was attempting to purchase Beacon Hill Golf Course.  Amendola said that he was looking for $1.5 million in short-term funding to be placed in a escrow account controlled by an escrow attorney to show Amendola's lender that he had capital.  The money placed in escrow was to be returned in five days.  Amendola further explained that he was attempting to obtain a $3.5 million loan from his lender to fully fund the purchase of the golf course.  During the call, Investor #2 confirmed with Amendola, the person purporting to be the Escrow Attorney, and Amendola's supposed lender that they understood that the $700,000 was not Amendola's money. The money was to show the lender that there was $1.5 million on deposit.  During the call, the the person purporting to be the Escrow Attorney provided his telephone number and e-mail address.  Someone purporting to be the Escrow Attorney later faxed a copy of Old Dominion Settlements, d/b/a Key Title's liability insurance, which had been requested by Investor #2.

30.     According to Investor #2, approximately one and a half weeks later, he spoke with someone who purported to be the Escrow Attorney.  During the call, the person purporting to be

-12-

the Escrow Attorney told Investor #2 that his wife was sick with cancer and that he was going to be out of the office. The "Escrow Attorney" provided Investor #2 with his cell phone number and a new e-mail address of t.wiltshire@olddominionsettlments.com, which the "Escrow Attorney" said he would have access to while he was out of the office.

31.    Investor #2 told me that he received an email from the t.wiltshire@olddominionsettlments.com account of the "Escrow Attorney" on June 15, 2011, with wiring instructions to send the $700,000 to a Capital One account with an account number ending in 0453 ("the Capital One account"). According to the bank's records, Amendola is the signatory for the Capital One account, which was opened at a branch in Reston Virginia, in the Eastern District of Virginia. Investor #2 wired the money from his bank account located in New Jersey to the Capital One account.

32.    According to Investor #2, on June 20, 2011, Amendola asked for a two-day extension to hold the money in escrow and offered to pay a fee. Investor #2 agreed to the additional two days in return for a fee of $14,000. Amendola subsequently wired the fee to Investor #2. After the two-day extension, Investor #2 did not receive the $700,000 back from the Escrow Attorney. Investor #2 called the "Escrow Attorney" at the cell phone number he had been given and asked for the $700,000 to be wired back to him. The "Escrow Attorney" apologized for the delay and told him that he would wire the money. The money was not returned to Investor #2 who again called the "Escrow Attorney" at the cell phone number he had been given. The "Escrow Attorney" apologized and told Investor #2 that his staff had inadvertently sent the money to another Capital Golf Partners investor.

33.     Investor #2 told me on June 24, 2011, that he still had not received his $700,000. Investor #2's attorney located the Escrow Attorney's address, work phone number, and work fax number by searching for the Escrow Attorney's company online. After locating the information, Investor #2's attorney faxed a demand letter to return the $700,000 to the Escrow Attorney. Later that day, Investor #2 called the Escrow Attorney's office by using the phone number published on the Escrow Attorney's company website. The Escrow Attorney answered the call, but told Investor #2 that he was in a meeting and would call him back. The Escrow Attorney called Investor #2 back and told him that he did not know who Investor #2 was and that he did not receive a $700,000 wire from Investor #2.

34.     According to Investor #2, he recorded a telephone call he had with Amendola. During the call Amendola admitted to Investor #2 that he took the $700,000. Amendola promised to pay back Investor #2 by obtaining $500,000 from a business associate and $200,000 from his mother. Amendola provided Investor #2 with a notarized promissory note to pay back the $700,000 in addition to giving Investor #2 a percentage interest in the golf course he was buying. According to Investor #2, the total amount of money that he has received from Amendola is approximately $87,500.

35.     On December 22, 2011, I interviewed Investor #2 who said that the cell phone number provided by the "Escrow Attorney" during the call in which he informed Investor #2 that his wife was sick and that he would be out of the office since was xxx-xxx-8646. Investor #2 documented the number in electronic notes he took when speaking to the "Escrow Attorney."

36.     On September 23, 2011, GoDaddy.com provided CDs with billing information and emails for t.wiltshire@olddominionsettlements.com in response to a search warrant for the

-14-

email account.  Review of the billing data showed that the email account was paid for by Brett
Amendola using a MasterCard credit card.  The billing address was listed as 19415 Deerfield
Avenue, Suite 316, Leesburg, Virginia, 20176.  VSCC records list this address as the principal
office address for Alexson Capital Management, LLC, for which the registered agent was
Amendola.  GoDaddy.com records also listed an email address of
j.walker@olddominionsettlements.com.

37.     Investor #2 provided me with an email he received on June 15, 2011 from
t.wiltshire@olddominionsettlements.com that stated, "Attached is the balance of documentation
to conclude this transaction . . . Regards, Tom."  Included in the email was an email from
j.walker@olddominionsettlements.com to t.wiltshire@olddominionsettlements.com dated June
15, 2011.  The email stated, "Tom, Attached is the receipt you requested. Sincerely, Jen."
Attached to the email was a letter purportedly on Key Title letterhead dated June 15, 2011,
addressed to Investor #2's company.  The letter stated, "Let this letter affirm that we received a
wire transfer into our escrow account in the amount of Seven Hundred Thousand Dollars
($700,000)."  The letter was purportedly signed by the Escrow Attorney.

38.     On September 15, 2011, I executed a search warrant on Amendola's residence.
An item seized during the search of Amendola's residence was a thumb drive that contained a
file that was the same as the attachment sent by j.walker@olddominionsettlements.com to
t.wiltshire@olddominionsettlements.com on June 15, 2011.

39.     Also during the search a T-Mobile cell phone with International Mobile Security
Identity (IMSI) number 310260434790385 was seized.  The IMSI number from the phone seized
during the search matched the subpoenaed records I received from T-Mobile for the mobile

-15-

number xxx-xxx-8646. I reviewed the text messages on the mobile phone and noted several messages from Investor #2's cell phone number addressed to the Escrow Attorney asking why he has not received the wire.

40.     I reviewed bank records for the Capital One account and noted that on June 15, 2011, the account received a $700,000 wire from Investor #2. I also noted a $629,000 wire transfer on June 15, 2011, from the Capital One account to the RMA Capital BOA account. After receiving the $629,000 wire, there were nineteen wire transfers totaling approximately $607,000 out of the account, including: a $6,500 wire to Janet Amendola, Brett Amendola's wife; a $250,000 wire to Roger Amendola's E-trade account; a $14,000 wire to Brevon Developers Inc, for which the VSCC listed Roger Amendola as the Vice President; a $50,000 wire to the M&T bank account; a $25,500 wire to investor #6; a $45,000 wire to the investor I interviewed on November 7, 2011; and eleven wires totaling $216,500 to other individuals and companies. Based on documents seized during the search of Amendola's residence, emails received from search warrants, and interviews, I believe that, of the eleven wire transfers, six totaling $187,000 were sent to individuals who apparently invested money with Amendola and may be potential additional victims.

*Investor #3*

41.     Investor #3 is an owner of Kam & Lam Corporation. On or about June 29, 2011, the Loudoun County Sheriff's Office interviewed Investor #3. Investor #3 was told by Amendola that he needed money from private lenders to show that he was solvent for a real estate transaction to buy Beacon Hill Golf Course that Amendola was attempting to close. The money was to be deposited into an escrow account held by the Escrow Attorney for approximately five

days, then returned to Investor #3.  Investor #3 received by email an irrevocable escrow

agreement and instructions purportedly signed by the Escrow Attorney and Amendola.  The

document was emailed from t.wiltshireesq@gmail.com.  After seeing the document, Investor #3

believed he could safely deposit money in the escrow account.  Investor #3 sent by wire transfer

$250,000 to the M&T Bank account, which he believed to be an escrow account.  Through public

source records, Investor #3 contacted the Escrow Attorney who told Investor #3 that the account

was not his.

42.    On September 21, 2011, Google provided a CD with the emails on their servers

for the email address t.wiltshireesq@gmail.com.  I reviewed the emails and noted an email dated

March 2, 2011, from bamendola@alexsonic.com, which was copied to

t.wiltshireesq@gmail.com and sent to Investor #3, and which contained a signed escrow

agreement purportedly by Amendola and the Escrow Attorney.  I also reviewed an email dated

March 22, 2011, from t.wiltshireesq@gmail.com to Investor #3 that stated, ". . . I will need you

to execute this amended Disbursement Request Letter so that I can confirm that the amount

needed to be wired back is $250,000.00 and not the $350,000.00 that was in the original

document I executed."  The document was subsequently signed by Investor #3 and sent back to

t.wiltshireesq@gmail.com.

43.    During the September 15, 2011, search of Amendola's residence, two laptop

computers were seized.  I reviewed the laptop computer contents and found a file that contained

the Disbursement Request Letter emailed from t.wiltshireesq@gmail.com.

44.    I reviewed the March 2011 statement for the M&T Bank account and noted that

on March 4, 2011, there were two incoming wires from Investor #3 in the amounts of $200,000

-17-

and $50,000. I also noted that on March 4, 2011, there were two outgoing wires totaling
$150,000 sent to Janet Amendola's Scottrade account and one outgoing wire totaling
approximately $100,000 to a pastor in Florida. Based on interviews I participated in, documents
I reviewed that were seized from Amendola's residence, and emails obtained by a search warrant,
I believe that the pastor provided Amendola with approximately $1.5 million to trade in the stock
market based upon Amendola having "guaranteed" the pastor's principle amount.

*Investor #4*

45.     Investor #4 is the owner of Finance California. I interviewed Investor #4 on July
26, 2011. According to Investor #4, a third party contacted him about an investment opportunity
to provide $250,000 in short-term funding to Amendola for a fee. Investor #4 was told by
Amendola that he needed proof of funds to close escrow for the purchase of Beacon Hill Golf
Course. Amendola claimed that the lender, Incite Financial, required Amendola to show that he
had $1.5 million placed in an escrow account with Old Dominion Settlements, d/b/a Key Title.
The money was to be deposited into an escrow account held by the Escrow Attorney for five
days, then returned to Investor #4.

46.     After some negotiations with someone purporting to be the Escrow Attorney,
Investor #4 received wiring instructions from t.wiltshire@olddominionsettlments.com. The
email instructed Investor #4 to wire the $250,000 to the Capital One account (the same account
to which Investor #2 had been told to wire his funds).

47.     Investor #4 received emails similar to those of the other investors, claiming that
the money would be returned but was delayed by an internal mistake.

48.    I reviewed the June 2011 statement for the Capital One account and noted that on June 24, 2011, the account received a $250,000 wire from Investor #4. I also noted that on June 24, 2011, there was a $200,000 wire transfer from the the Capital One account to the RMA Capital BOA account and a $50,000 wire back to Investor #4. After the RMA Capital BOA account received the $200,000 wire, I noted seven wire transfers out of the account totaling approximately $210,000 which included: a $3,000 wire to Janet Amendola; a $3,000 wire to Brevon Developers Inc; a $14,000 wire to Investor #2; and four wires totaling $190,000 to other individuals and companies. Based on documents seized during the search of Amendola's residence, emails received from search warrants, and interviews, I believe that the individuals who received the four wires totaling $190,000 appear to have invested money with Amendola and may be potential additional victims.

49.    During the September 15, 2011, search of Amendola's residence, a thumb drive was seized that contained a file addressed to Investor #4 that stated, "Let this letter stand as documentation that our firm was directed to disburse from escrow funds totaling Two Hundred Fifty Thousand Dollars ($250,000) in accordance with the Irrevocable Escrow Agreement dated June 23, 2011." The letter was purportedly signed by the Escrow Attorney.

50.    As mentioned above, during the search of Amendola's residence a T-Mobile cell phone was seized that has the mobile number xxx-xxx-8646, which was the cell phone number provided to Investor #4 from a person purporting to be the Escrow Attorney. The toll records for this number show multiple outgoing calls to Investor #4's phone number.

-19-

*Investor #5*

51.    Investor #5 was interviewed by an investigator from Loudoun County Sheriff's Office. Investor #5 said that she was contacted by Amendola in reference to providing a short term loan to provide funds in escrow for Amendola to satisfy the bank's requirements for lending. Amendola told Investor #5 that the loan he was attempting to get was for the purchase of a golf course known as Beacon Hill Golf Course in Leesburg, Virginia. Investor #5 said that Amendola promised that her funds would be held in escrow for "no more than a few days to a week" and would then be returned to her with interest. Investor #5 said that she wired $500,000 to Amendola from her account in Los Angeles, California to the M&T Bank account.

52.    I reviewed the March 2011 statement for the M&T Bank account and noted a March 30, 2011, incoming wire from Investor #5 in the amount of $500,000. I also noted a $497,000 wire transfer on March 30, 2011, from the M&T Bank account to the RMA Capital BOA account. After the RMA Capital BOA account received the $497,000 wire, I noted ten wire transfers out of the account totaling $448,500, which included: a $50,000 wire to Investor #6 (discussed below); a $50,000 to Investor #3; a $15,000 wire to the Escrow Attorney; a $7,000 wire to Brevon Developers Inc; a $250,000 wire to the pastor in Florida; and five wires totaling $76,500 to other individuals and companies. Based on documents seized during the search of Amendola's residence, emails received from search warrants, and interviews, I believe that the five wire transfers totaling $76,500 were sent to individuals or companies who appear to have invested money with Amendola and may be potential additional victims.

*Investors #6, #7, and #8*

53.     Investors #6, #7, and #8 used 1031 ECI, LLC (1031 ECI) to complete so-called

"1031 property exchanges," which are like-kind exchanges allowed by the United States tax

code.  On September 21, 2011, I interviewed Investor #6, who said that he used 1031 ECI to

close on a 1031 property exchange in Washington.  At the conclusion of the closing, Investor #6

requested that the owner of 1031ECI provide him the balance of approximately $825,000 that

was held by 1031 ECI.  The 1031 ECI owner told Investor #6 that for tax reasons he could not

have his money for 180 days from the closing.

54.     On September 12, 2011, which was 180 days after the closing, Investor #6 went

back to 1031 ECI's office and requested that the owner return his $825,000.  The 1031 ECI

owner told Investor #6 that his money was not available since the 1031 ECI owner had

transferred the amount to Key Title as part of a secure investment.  However, according to the

1031 ECI owner, the money had ended up in the M&T Bank account and an imposter had

redirected the funds to facilitate a large loan transaction.

55.     I reviewed a recorded call between Investor #6 and the owner of 1031 ECI that

occurred on September 22, 2011.  During the call, the 1031 ECI owner explained that he had

originally wired Investor #6's money to Key Title to be invested in a Virginia golf course that

was being bought by Amendola.  The 1031 ECI owner also explained that he had gone to

Virginia and had met Amendola to see the golf course.

56.     On September 21, 2011, I interviewed Investor #7, who said that she used 1031

ECI to close on a 1031 property exchange in Washington.  On approximately July 15, 2011,

Investor #7 was at the closing on a 1031 property exchange; however, a representative from the

title company informed Investor #7 that the money received from 1031 ECI was $350,000 short to complete the purchase. Investor #7 subsequently contacted the owner of 1031 ECI who told her that he had previously wired approximately $389,000 of her money to the Escrow Attorney at Key Title.

57.     On September 23, 2011, I interviewed Investor #8, who said that she used 1031 ECI to close on a 1031 property exchange in Washington. As part of the 1031 sale, the buyer of Investor #8's property agreed to pay a $350,000 non-refundable deposit prior to the closing. In approximately July 2011, the owner of 1031 ECI called Investor #8 and explained that her money was located at Key Title. Investor #8 subsequently called the title company who was involved with the 1031 property exchange. Investor #8 was told that the title company had wired the $350,000 non-refundable deposit to the owner of 1031 ECI at his direction.

58.     I reviewed the 2011 bank account statements for 1031 ECI and noted three wire transfers totaling $1,295,000 to the M&T Bank account. The wire transfers, which originated from an account in the State of Washington, occurred on February 22, 2011, in the amount of $500,000; on April 29, 2011, in the amount of $375,000; and on May 9, 2011, in the amount of $420,000.

59.     I reviewed the February 2011 statement for the M&T Bank account and noted a February 22, 2011, incoming wire from 1031 ECI's bank account in the amount of $500,000. I also noted a $290,000 wire transfer on February 22, 2011, from the M&T Bank account to the RMA Capital BOA account and a $200,000 wire transfer from the M&T Bank account to Janet Amendola's Scottrade account.

60.     After the RMA Capital BOA account received the $290,000 wire, there were twelve wire transfers out of the account totaling $271,000, which included: a $25,000 wire to 1031 ECI's bank account; a $52,000 wire to Old Dominion Settlements; a $60,000 wire to the pastor in Florida; and nine wires totaling $134,000 to other individuals and companies.  Based on documents seized during the search of Amendola's residence, emails received from search warrants, and interviews, I believe that the nine wires totaling $134,000 were sent to individuals or companies who appear to have invested money with Amendola and may be potential additional victims.

61.     I reviewed the April 2011 statement for the M&T Bank account and noted an incoming wire on April 29, 2011, from 1031 ECI's bank account in the amount of $375,000.  I also noted that on April 29, 2011, there was a $215,000 wire transfer from the M&T Bank account to the RMA Capital BOA account and a $160,000 wire transfer from the M&T Bank account to Janet Amendola's Scottrade account.

62.     After the RMA Capital BOA account received the $215,000 wire, I noted thirteen wire transfers out of the account totaling approximately $209,000, which included: a $53,645 wire to Investor #5; a $4,000 wire to Brevon Developers Inc; a $3,000 wire to Janet Amendola; a $90,000 wire to the investor I interviewed on November 7, 2011; a $10,000 wire to the County of Clark; and six wires totaling $34,000 to other individuals and companies.

63.     I reviewed the May 2011 statement for the M&T Bank account and noted a May 9, 2011, incoming wire from 1031 ECI's bank account in the amount of $420,000.  I also noted that on May 9, 2011, there was a $220,000 wire transfer from the M&T Bank account to the

RMA Capital BOA account and a $200,000 wire transfer from the M&T Bank account to the investor I interviewed on November 7, 2011.

64.     After the RMA Capital BOA account received the $220,000 wire, I noted three wire transfers out of the account totaling $215,000, which included: a $140,000 wire to the investor I interviewed on November 7, 2011; a $50,000 wire to the Florida pastor; and a $25,000 wire to Janet Amendola's Scottrade account.

65.     On one of the laptop computers seized from Amendola's residence, I found a document labeled "Irrevocable Escrow Agreement and Instructions" that was dated February 22, 2011, which was an agreement between RMA Capital, 1031 ECI, and Key Title. The document stated 1031 ECI agreed to deposit $500,000 with Key Title for a fee of $25,000 to be paid by RMA Capital to 1031 ECI. I also reviewed a document labeled "Irrevocable Escrow Agreement and Instructions" that was dated April 29, 2011, which was an agreement between RMA Capital, 1031 ECI, and Key Title. The document stated that 1031 ECI agreed to deposit $375,000 with Key Title for a fee of $10,000 to be paid by RMA Capital to 1031 ECI.

66.     Another document on one of the laptop computers seized from Amendola's residence was labeled "Limited Liability Company Interest Assignment Agreement." The document was dated April 29, 2011, stated that RMA Capital owned sixty percent of Capital Golf Partners, and assigned ten percent ownership to the owner of 1031 ECI.

67.     A thumb drive with files that was seized from the search of Amendola's residence contained a document dated July 20, 2011, that was addressed to Investor #7's attorney and purportedly signed by the Escrow Attorney. The letter stated that the $350,000 sent to the Escrow Attorney by 1031 ECI was being held in his escrow account at Capital One Bank. I

-24-

reviewed a document from the thumb drive dated July 20, 2011, which was addressed to Investor #8 and purportedly signed by the Escrow Attorney. The letter stated that the $250,000 sent to the Escrow Attorney by 1031 ECI was being held in his escrow account at Capital One Bank. I also reviewed a document from the thumb drive dated July 20, 2011, which was addressed to Investor #8's attorney and purportedly signed by the Escrow Attorney. The letter stated that the $250,000 sent to the Escrow Attorney by 1031 ECI was being held in his escrow account at Capital One Bank.

68.     I reviewed the text messages on the T-Mobile phone seized from Amendola's home and noted several messages from the owner of 1031 ECI addressed to the Escrow Attorney and messages back to the owner of 1031 ECI. The messages were discussing when the Escrow Attorney was going to send verification letters to Investors #7 and #8. The messages also discussed when the Escrow Attorney was going to release the funds.

69.     On September 21, 2011, Google provided a CD with the emails on their servers for the email address t.wiltshireesq@gmail.com. I reviewed the emails and noted an email dated February 22, 2011, from bamendola@alexsonic.com, which was copied to t.wiltshireesq@gmail.com and sent to the owner of 1031 ECI. It contained a escrow agreement, purportedly signed by Amendola and the Escrow Attorney, for the owner of 1031 ECI to deposit $500,000 at Key Title. The email also contained wiring instructions to wire the $500,000 to the M&T Bank account.

*Investor #9*

70.     On January 3, 2012, I interviewed Investor #9, who previously did business with 1031 ECI. Investor #9 said that in approximately the summer of 2011, he was contacted by the

owner of 1031 ECI who introduced him to Amendola. During the telephone call, Amendola explained that he was looking for a loan of approximately $170,000 so he could complete the purchase of the golf course. Amendola further explained that he would only need to use Investor #9's funds for approximately forty-five days, until he received secondary funding. Amendola agreed to pay approximately fourteen percent interest on the loan. In addition, the golf course home owners' association dues would be used as collateral for Investor #9's loan. Investor #9 agreed to make the loan and subsequently wired approximately $170,000 to 1031 ECI's business account. Approximately thirty to forty-five days later, Investor #9 received his $170,000 back. Investor #9 assumed the purchase of the golf course was complete.

71.     Approximately in July 2011, the owner of 1031 ECI contacted Investor #9 and explained to him that the sale of golf course did not close and that Amendola needed $215,000 quickly to close on the sale of the golf course. The owner of 1031 ECI said that if Investor #9 made the loan, Amendola would provide the same terms as the previous loan. Investor #9 agreed to make the loan and subsequently wired $215,000 to 1031 ECI's business account. Through conversations, emails, and text messages with the owner of 1031 ECI and Amendola, it was Investor #9's belief that the $215,000 he loaned to Amendola was pledged to Incite Financial, who was going to fund the loan to purchase the golf course. Investor #9 made the loan since he had been repaid by Amendola the first time and he assumed the owner of 1031 ECI would not release the money without the agreed security.

72.     Investor #9's money was not returned to him after forty-five days. Over several months, the owner of 1031 ECI and Amendola were assuring him that he would get repaid once the golf course sale was completed. In approximately September 2011, the owner of 1031 ECI

-26-

wired back $10,000 to Investor #9 as partial payment of the loan.  The owner of 1031 ECI explained that he had not released $10,000 of the $215,000 Investor #9 loaned to Amendola.

73.     Approximately the week before Thanksgiving 2011, Investor #9 met with the owner of 1031 ECI and called Amendola.  During the call Amendola explained that he was making a lot of money in the stock market and would be able to repay Investor #9 soon since one of his clients, a seventy-year-old man, owed a lot of money to Amendola.

74.     On approximately December 19, 2011, Amendola called Investor #9 asking how much he owed Investor #9.  Investor #9 told Amendola that he owed him $241,000, which included interest.  Amendola told Investor #9 that he had a cashier's check for $350,000 and asked whether, if Amendola were to deposit the cashier's check directly into Investor #9's account, Investor #9 would then send Amendola back $109,000.  Investor #9 agreed and provided Amendola with his account information at Charles Schwab.

75.     On December 20, 2011, Amendola deposited a $350,000 check into Investor #9 account.  After Investor #9 saw the check deposited into his account, he wired $109,000 back to Amendola.  On December 23, 2011, a Charles Schwab representative told Investor #9 that the $350,000 check had been returned for insufficient funds.  The Charles Schwab representative also told Investor #9 that the check had been deposited at the Reston, Virginia, Charles Schwab branch.  The Charles Schwab representative provided Investor #9 with a copy of the returned check.  After reviewing the check, Investor #9 saw that it was not a cashier's check, but instead was a check written on the Capital One bank account into which Investor #9 had just wired the $109,000 to Amendola.

-27-

76.     I reviewed the 2011 bank account statements for 1031 ECI and noted a May 20, 2011, incoming wire of $175,000 from Investor #9. I also noted an outgoing wire of $175,000 on June 17, 2011, to Investor #9. In addition, I noted an incoming wire of $215,000 on July 7, 2011, from Investor #9.

77.     Investor #9 provided me with a screen shot of his Charles Schwab account showing on December 20, 2011, a deposit of $350,000 and an outgoing wire of $109,000. It showed that the deposit of $350,000 was returned due to insufficient funds on December 23, 2011.

78.     On December 30, 2011, I received a telephone call from Capital One Bank's risk assessment department about a possible fraud by Amendola. The Capital One Bank representative explained that he had received a call from a Charles Schwab representative who stated its client wanted to recall a $109,000 wire to Amendola due to fraud. The Capital One representative told the Charles Schwab representative that the money had already been transferred out of the account. After receiving the call, the Capital One representative reviewed Amendola's account activity and thought that it was suspicious, since money had been wired into the account and immediately wired out of the account. The Capital One representative spoke with Amendola about his activity. Amendola explained that he was paying investor commissions.

79.     On January 4, 2012, I again spoke with the Capital One representative who said that the $350,000 check deposited at Charles Schwab had been written on the Capital One account and was not a cashier's check. The Capital One representative reviewed the account activity and noted that the $109,000 wire was deposited into Amendola's account on December

-28-

20, 2011 from Charles Schwab.  On December 21, 2011, an outgoing wire of $73,000 was sent to Brevon Developers; a $9,000 check was written; and a $420 ATM withdraw was made.  On December 22, 2011 a $39,500 check was written; and three cashier's checks in the amounts of $7,000, $5,000, and $3,000 were made payable to Amendola or Roger Amendola.  The cashier's checks were cashed at a Capital One branch.  On December 23, 2011, two $30,000 checks were written. The balance of Amendola's account was overdrawn by approximately $86,000.

*Recent Activity*

80.     On January 5, 2012, I spoke with the Capital One representative who said that on January 5, 2012, Amendola opened a new business account at the Capital One Bank Dulles Town Crossing branch in Sterling, Virginia.  The business name on the account was ARCA Capital Management, LLC, with an address of 20073 Forest Farm Lane, Ashburn, Virginia.  The incorporating paperwork provided by Amendola showed that ARCA was incorporated online on January 3, 2012.  While opening the new business account, Amendola told the Capital One representative that he was expecting two incoming wires from California and one incoming wire from New Jersey totaling approximately $1.5 million.

CONCLUSION

For the foregoing reasons, I submit that there is probable cause for a criminal complaint charging Brett Anthony Amendola with devising and executing a scheme and artifice to defraud

and to obtain money and property by means of false and fraudulent pretenses by use of interstate

wires, in violation of 18 U.S.C. § 1343.

John S. Posusney
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 9ᵗʰ day of January, 2012.

_____/s/_____
Ivan D. Davis
United States Magistrate  Judge

-30-