IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN RE SEARCH OF: | )<br>) No. 1:20-SW-980 |
| CRESCENT POINT PLACE | ) |
| ASHBURN, VIRGINIA | ) UNDER SEAL<br>) |

AFFIDAVIT IN SUPPORT OF
AN APPLICATIONS FOR A SEARCH WARRANT

Javier A. Gonzalez, being duly sworn, says:

INTRODUCTION

1.      I have been a special agent with the Federal Bureau of Investigation since

2003.  I am currently assigned to a white collar crime squad at the Washington Field

Office of the FBI.  During my FBI career I have participated in numerous investigations

of criminal activity, including violations related to securities fraud, bank fraud,

corporate fraud, mail fraud, wire fraud, conspiracy, and money laundering.  I am a

Certified Public Accountant and was employed as an auditor and as a revenue agent

with the Internal Revenue Service prior to joining the FBI.

2.      I am familiar with the information contained in this affidavit as a result of

my participation in the investigation.  This affidavit is based upon information from

multiple sources, including my personal observations, information provided by

witnesses, information provided by regulatory agencies and/or other law enforcement

agents, documents and financial records provided by different entities and individuals,

and publicly available information.  Where the statements of others are related herein,

those statements are related in substance and not verbatim.  Because I am submitting

this affidavit only for the purpose of establishing probable cause for a search warrant, it does not include all the facts known to me as a result of the investigation.

3.      I submit this affidavit in support of an application for a search warrant for the residence of Brett A. Amendola,          Crescent Point Place, Ashburn, Virginia, as further described in Attachment A.  Amendola resides with his parents at this address.

4.      For the reasons below, I submit that there is probable cause to believe that Amendola is engaged in wire fraud, in violation of 18 U.S.C. § 1343, among other crimes, and that fruits, evidence, and instrumentalities of these violations, that is, the items listed in Attachment B, will be found at the premises to searched.

AMENDOLA'S BACKGROUND

5.      On April 4, 2012, Amendola pled guilty to committing wire fraud, in violation of 18 U.S.C. § 1343.  *United States v. Amendola*, 1:12-CR-00116 (E.D. Va., Apr. 4, 2012) (Lee, J.) (Dkt 24).  According to Amendola's statement of facts,

> [I]n 2010 and 2011, the defendant persuaded various investors to provide short-term funding to the defendant by telling the investors that he was attempting to purchase a golf course in Loudoun County, Virginia. Amendola explained to the investors that he was looking for short-term funding to be placed in an escrow account controlled by an attorney in Reston, Virginia (hereafter referred to as the Escrow Attorney) to show Amendola's lender for the purchase of the golf course, Incite Financial, that he had capital.  The money was to be returned to the investors within a matter of days.  Instead, however, Amendola diverted the investors' funds to his own use by, among other things, posing as the Escrow Attorney in email messages and telephone calls with the investors, thereby leading the investors to wire the funds to an account controlled by Amendola, not the Escrow Attorney.  Amendola made similar misrepresentations to other investors to induce them to wire funds to accounts controlled by Amendola.

*Id.* (Dkt 25).  In essence, the defendant's wire fraud involved a *Ponzi* scheme in which, after various lulling statements by Amendola failed, he would pay earlier victims with

later investors' money.  I incorporate by reference the statement of facts signed by Amendola and filed in that case.

6.      As part of the 2011 fraud scheme, Amendola incorporated companies with names that were similar to the names of already-established companies to lead victims into believing that they were dealing with those companies.  Amendola also incorporated companies with names that he had devised, bank and brokerage accounts in the names of those companies, and email accounts that he had created in the names of those companies.  In transferring proceeds obtained through the fraud, Amendola also used a bank account in the name of Brevon Developers Inc., a company owned and controlled by Amendola's father.  *Id.*

7.      As part of the 2011 fraud scheme, Amendola used multiple telephone numbers to communicate with the victims.  Occasionally, Amendola posed as other individuals while using the telephone numbers.  As mentioned above, Amendola posed as a lawyer in telephone conversations with victims of this previous scheme.

8.      As part of the 2011 fraud scheme, and to lull victims of the scheme, Amendola knowingly gave checks to the victims that were written on accounts that had insufficient funds to cover the amounts of the checks.

9.      On March 19, 2013, Amendola was sentenced in this District to eighty-four months in prison, having earlier pled guilty to committing wire fraud.  *Id.* (Dkt 64).  At the same time, Amendola was ordered to pay restitution of more than $2.8 million to the victims of his fraud.

10.     Amendola was released from prison on or about October 6, 2017.[1]  Among the terms of Amendola's supervised release the defendant was required to:

a.     "notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement",[2]

b.     "not obtain any new lines of credit without the express, advance permission of the Probation Officer", and

c.     "apply all monies received from income tax refunds, lottery winnings, inheritances, judgments, and any other expected or unexpected financial gains, toward his restitution obligation."

11.     According to Amendola's Probation Officer and a National Crime Information Center record obtained on July 14, 2020, Amendola will be on supervised release until October 5, 2020.

STATEMENT OF PROBABLE CAUSE

12.     As discussed below, since his release from prison, Amendola has used various accounts in various names to receive and send wire transfers to several individuals and entities.  Although it is unclear at this point in the investigation whether these individuals and entities are victims (or even potential co-conspirators), the pattern

---

[1] The government had filed a rule 35 motion to recognize Amendola's cooperation against a co-conspirator.

[2] According to Amendola's Probation Officer, Amendola's conditions of release do not specifically preclude Amendola from handling or managing funds belonging to others.

of transfers is consistent with a *Ponzi* scheme and other criminal activity of the kind for which Amendola has been convicted.  The individuals and entities include the following:

    a.     Samuel Dealey

    b.     Stephanie Dosik

    c.     Jason Goldsberry

    d.     Donald Hartman

    e.     Jorge Diaz

    f.     Earl Burger

    g.     Monument Communications LLC

    h.     Domenick Alario

    i.     Austin Jacobs

    j.     Daniel Coyle

    k.     Thomas Coyle

    l.     David Baker

    m.     Paul Apostolopoulos

    n.     LAD Marketing Group LLC

13.    Upon his release from prison, Amendola began renting a home in Leesburg, Virginia, that is worth approximately $1 million, according to Amendola's ex-wife.  Amendola's ex-wife also said that Amendola told her that an inmate that Amendola met in prison gave him $1 million.  Sometime later, during child custody proceedings, Amendola testified that he received approximately $25,000 from the inmate.

14.    Records obtained from telephone service providers show that Amendola at one point was associated with four different telephone numbers.

*Ignite Beverage Corp.*

15.     Amendola told his probation officer that he was employed by Ignite Beverage Corp.  Its now-defunct website, ignitebeveragecorp.com, had displayed a logo that was similar to an established company called Ignite Draft Beverage Branding.  As discussed above, Amendola's previous scheme included the creation of entities with names similar to those of existing entities, to give the appearance to the victims that they were dealing with a legitimate established company.

16.     According to records obtained from the registrar of the ignitebeveragecorp.com domain name, it was registered by Amendola using an address on Crescent Point Place, Ashburn, Virginia, and an email account of brettamendola@yahoo.com.

17.     Bank records show that a Porsche Panamera driven by Amendola was purchased in June 2017 for $103,970 with a $93,091 loan from M&T Bank.  The Porsche was titled in the name of Ignite Beverage Inc., which, according to articles of incorporation Amendola emailed his probation officer on October 16, 2017, was incorporated in Nevada by Amendola's mother on April 26, 2017.  Amendola's father was a co-applicant on the M&T Bank loan.  Amendola identified his father as a director of Ignite Beverage Inc. in an email he sent on June 23, 2017 to the salesperson with whom he was negotiating the purchase of the Porsche.  The loan statements show that the first payment, due on August 12, 2017, was not made and show an irregular payment history beginning in March 2018 (e.g. missed payments, reversed payments, etc.).  In June 2018, a recovery agent contacted Amendola's ex-wife concerning the Porsche.  The last payment noted on the statements was a $2,601.35 payment made on November 30, 2018.  The statements contain an "extension granted" entry dated January 8, 2019.

18.     Wells Fargo accounts xxx-2406 and xxx-3156 have one owner, Brevon Developers, and one authorized signer, Amendola's father.  Deposits to account xxx-3156 included a $3,958.84 check made payable to Amendola from an account belonging to Ignite Beverage Inc., and checks issued by Amendola from TD Bank account xxx-2094.  Withdrawals from account xxx-3156 included checks made out to Ignite Beverage Inc. and to Amendola and a $50,000 check dated December 20, 2018 to Stephanie Dosik.  Account xxx-3156 appears to have been closed on February 25, 2019, with a charge off credit of $35,715.88.  Account xxx-2406 had a balance of negative $5.98 on February 28, 2019.

*Arca Enterprises Inc.*

19.     Arca Enterprises Inc. is the owner of TD Bank account xxx-2094, which was opened on September 6, 2018.  Amendola and his mother have signature authority on the account.  According to corporate records provided by TD Bank, Arca Enterprises Inc. was incorporated in Virginia on February 8, 2017, with Amendola's mother as its director, president, treasurer, and secretary.  Amendola is shown as a manager.

20.     Between September 13, 2018 and January 1, 2019, deposits to TD Bank account xxx-2094 included the following:

  a. Three wire transfers totaling $101,000 from Stephanie Dosik,

  b. A $20,000 wire transfer from Jason Goldsberry,

  c. Three wire transfers totaling $25,000 with the note "partnership seed money," consisting of a $10,000 wire from Samuel Dealey and two wires totaling $15,000 from Samuel Dealey's business, Monument Communications LLC.

  d. A $10,000 wire transfer from Donald Hartman,

      e.       Two wires transfers totaling $17,000 from Amendola's father,

      f.       A $35,000 check from Jorge Diaz, and

      g.       Two wire transfers totaling $31,000 from Earl Burger.

21.     During the same period of the deposits listed above, there were the following withdrawals:

      a.       Nine wires transfers totaling $102,700 sent to Amendola's father's Charles Schwab account xxx-8024,

      b.       Three checks totaling $14,508 made payable to cash and endorsed by Amendola,

      c.       A $5,000 wire transfer to Jorge Diaz and three checks totaling $15,000 made payable to Jorge Diaz,

      d.       A $10,000 check made payable to Earl Burger,

      e.       A $2,000 check made payable to Amendola's father, and

      f.       Two checks totaling $12,500 made payable to Amendola's father's company, Brevon Developers.

22.     SunTrust Bank account xxx-7726 was opened in the name of Arca Enterprises Inc. on January 7, 2019.  The account has one signer, Amendola, who is listed as Arca's president.  SunTrust accounts xxx-9547 and xxx-9513 were opened on December 31, 2018, by Amendola, the only signer on the accounts.

23.     The activity reported in the statements for these SunTrust accounts includes the following:

      a.       ATM and cash deposits from January 7, 2019 to March 19, 2019 totaling around $73,000,

b.    Branch withdrawals from January 7, 2019 to January 31, 2019 totaling around $39,708

c.    A $19,000 wire transfer from Jorge Diaz on January 7, 2019,

d.    A $27,500 wire transfer to Amendola's father on January 9, 2019,

e.    A $30,000 check payable to Jason Goldsberry on January 8, 2019,

f.    A $10,000 wire transfer from Amendola's father's Interactive Brokers account xxx-6661 on January 16, 2019,

g.    A $18,000 wire transfer to Amendola's father's Interactive Brokers account xxx-6661 on January 18, 2019,

h.    A $9,000 PayPal deposit on January 24, 2019, which matches an amount provided to Amendola by Samuel Dealey,

i.    A $3,000 wire transfer from Amendola's father's Interactive Brokers account xxx-6661 on January 24, 2019,

j.    A $5,000 wire transfer to Jorge Diaz on January 2, 2019,

k.    A $5,300 check payable to Stephanie Dosik that cleared on February 1, 2019,

l.    A $5,400 wire transfer to Stephanie Dosik on February 5, 2019,

m.    A $8,700 wire transfer to Paul Apostolopoulos on February 14, 2019, and

n.    A $7,700 check made out to and endorsed by Amendola that cleared on March 21, 2019.

24.    SunTrust Bank also produced records of telephone calls concerning the accounts, including the following:

    a.    A call made to SunTrust on February 14, 2019, by Community Financial Check Cashing asking if Arca's SunTrust account had sufficient funds for a $15,500 check, which it did not,

    b.    A call made to SunTrust on February 19, 2019 by Citibank asking if Arca's SunTrust account had sufficient funds for a $10,000 check, which it did not, and

    c.    A call from Amendola to SunTrust Bank on March 20, 2019, in which he asked if his account, which had been overdrawn for a week or two, was still open.  During the call, Amendola claimed that he was expecting a large incoming wire to the account.

25.    TD Bank account xxx-1161 is owned by Amendola. The account was opened on August 21, 2018, and only Amendola has signature authority on the account. Deposits to the account included a $14,500 PayPal transfer on November 28, 2018, which matches a wire transfer Samuel Dealey sent to Amendola, and a $31,000 wire transfer from Stephanie Dosik on December 24, 2018.  On December 26, 2018, $18,000 was wire transferred from this account to Interactive Brokers account xxx-5661, which was owned by Amendola's father.

26.    Amendola is also the owner and sole signer on TD Bank account xxx-9237, which was opened on August 21, 2018.  Deposits to this account consisted mostly of transfers from Arca Enterprises Inc.'s TD Bank account xxx-2094 and Amendola's TD Bank account xxx-1161.  Withdrawals from account xxx-9237 included a $5,000 wire transfer to Jorge Diaz on December 20, 2018, and a $16,500 wire to Amendola's father's Interactive Brokers account xxx-5651 on December 20, 2018.

27.     On April 5, 2017, Amendola's mother opened United Bank account xxx-4888 in the name of Arca Enterprises Inc.  A second signature card, dated March 5, 2018, identifies the account's owners as Amendola's mother and Amendola.  The account was charged off on May 29, 2018 when it had a negative balance of $174.98.

28.     According to records provided by Charles Schwab, Amendola's father is the sole owner of account xxx-8024.  An October 9, 2017 Charles Schwab account verification letter addressed to Amendola's father shows that Amendola's email, brettamendola@yahoo.com, is associated with this account.  The records show that the account had a balance of $1,459 on January 31, 2017, and $1.68 on December 31, 2018.  However, the activity reported in the statements includes investment purchases and sales, transaction gains and losses, and incoming and outgoing wire transfers.  Incoming wire transfers totaled approximately $86,000 in 2017 and $122,400 in 2018.  The majority of the incoming wires in 2018 (which totaled $102,700) came from Arca Enterprises Inc.'s TD Bank account xxx-2094.

29.     On November 20, 2018, TD Bank filed a Suspicious Activity Report (SAR) concerning Amendola, and two other individuals, Paul Apostolopoulos and Jennifer Fiorello-Perez, regarding suspicious check and wire activity and the rapid rotation of funds in Paul Apostolopoulos's and Jennifer Fiorello-Perez's personal accounts.  The transactions totaled $106,587 and occurred between December 2017 and September 2018.  Paul Apostolopoulos received checks from Arca Enterprises Inc. and from Amendola's father's company, Brevon Developers.

30.     Amendola is the sole owner of United Bank account xxx-0149.  On July 25, 2018, and November 7, 2018, United Bank filed two SARs concerning Amendola, Amendola's father, and Paul Apostolopoulos regarding suspected money laundering and

check fraud, and suspicious check, wire, and cash transactions in Amendola's account. The transactions totaled $136,462 and were conducted from January 2018 to September 2018.  Among these were a $7,000 check to Paul Apostolopoulos in March 2018, a $10,000 check to Paul Apostolopoulos in April 2018 that was returned unpaid, and four wire transfers totaling $14,100 from Paul Apostolopoulos in May and June 2018.  There was also a $10,000 check to Amendola's father that was returned unpaid.

*United Canna, LLC*

31.     On September 24, 2019, a Tennessee resident, Tandy King, filed a civil complaint against Amendola and other individuals and entities.  A copy of the complaint is attached as Exhibit 2.  According to the complaint, in early July 2019, Amendola contacted King saying that he was interested in Mr. King's industrial hemp plants. Within a week, Amendola and King had reached an agreement for Amendola to purchase a number of clones and mother plants from King.  Amendola claimed that he had formed "United Canna Corp" to begin a hemp operation in Northern Virginia.

32.     According to the Virginia Corporations Commission, United Canna LLC was created by Amendola's father on July 12, 2019.  However, an Internet search for "United Canna" shows that there is already an established company named "United Canna Supply" that distributes a wide variety of products, including hemp-related products, throughout the United States.  As discussed above, Amendola's previous scheme included the creation of entities with names similar to those of existing entities.

33.     According to King's complaint, on July 12, 2019, Amendola claimed that his "lawyer" had wired half the purchase price of the hemp, which was to be paid before the hemp was delivered.  According to the complaint, the funds were never wired.  As

discussed above, in Amendola's previous scheme, he posed as a lawyer in order to lull his victims into a false sense of security.

34.    According to the complaint, on July 15, 2019, King delivered the hemp to a farm designated by Amendola.  At the time of the delivery, it was nearly midnight.  King told Amendola that it would be best to wait until the following morning to unload the crops so that they could be inspected.  However, Amendola insisted that the plants be unloaded immediately.

35.    According to the agreement, the second half of the purchase price was to be paid upon delivery.  By that time, however, Mr. King had not received any money from Amendola.  On the night of the delivery, Amendola gave King a $26,500 check for the second half of the purchase price and claimed that the wire payment for the first half of the purchase price was processing.  However, when King went to cash the check, he was told by the bank that the check would not clear because there were insufficient funds in the account.

*Amendola's Gambling*

36.    According to Currency Transaction Reports (CTRs) filed by MGM National Harbor, Amendola conducted the following cash transactions:

    a.    Casino chips worth $10,520 purchased on July 17, 2017,

    b.    Casino chips worth $22,000 redeemed on July 19, 2017,

    c.    Casino chips worth $10,200 purchased on March 27, 2018,

    d.    Casino chips worth $13,030 redeemed on April 5, 2018,

    e.    Casino chips worth $12,513 redeemed on January 23, 2019,

    f.    Casino chips worth $12,000 purchased on January 24, 2019,

    g.    Casino chips worth $17,600 redeemed on January 25, 2019,

h.      Casino chips worth $14,600 redeemed on January 28, 2019,

i.      Casino chips worth $11,400 redeemed on January 29, 2019,

j.      Casino chips worth $11,100 purchased on January 31, 2019,

k.      Casino chips worth $12,675 redeemed on February 1, 2019, and

l.      Casino chips worth $19,600 redeemed on February 4, 2019.

37.     According to records from Hollywood Casino, between September 2018 and January 2019, Amendola engaged in transactions totaling $302,300.  However, it appears that Amendola had a net loss of $13,715 during this time.  Amendola was escorted out of the casino three times, one of which was because he had been banned from the casino due to alleged money laundering.

38.     Other CTRs show that Amendola also had cash transactions at Charles Town Gaming.

<em>Amendola's False Claims and Lulling Statements to Investors</em>

<em>Samuel Dealey</em>

39.     Samuel Dealey was interviewed by the FBI on October 3, 2019 and May 11, 2020.  Shortly after Amendola was released from prison, Amendola convinced Samuel Dealey to invest money with Amendola.[3]  Samuel Dealey wired Amendola $10,000 on October 30, 2018, $10,000 on October 31, 2018, and $5,000 on November 1, 2018.  Amendola claimed that he would match Samuel Dealey's investment and deposit the funds into a trading account from which Amendola would trade financial instruments.  On November 26, 2018, Samuel Dealey gave Amendola an additional $14,500 via

---

[3] Samuel Dealey had been introduced by Amendola's sister, who had been Samuel Dealey's girlfriend.  Samuel Dealey knew that Amendola had been convicted, and he visited Amendola in prison.

PayPal because Amendola claimed that he needed the money immediately to cover an options trade that Amendola had executed. On January 23, 2019, Samuel Dealey gave Amendola an additional $9,000 via PayPal and a $14,000 check because Amendola again claimed that the money was needed immediately to cover an options trade.

40.     Under his agreement with Amendola, Samuel Dealey understood that every time he gave Amendola money, Amendola deposited the funds in their trading account and also made a matching deposit. According to Samuel Dealey, Amendola therefore should have deposited in the trading account the $62,500 Samuel Dealey gave him plus $62,500 of Amendola's own money. However, I have examined Amendola's bank accounts, including the accounts to which Samuel Dealey wired his funds, and they show that only a portion of Samuel Dealey's funds were transferred to a Charles Schwab account belonging to Amendola's father. For example, of the $25,000 Samuel Dealey wired to Amendola on October 30, October 31, and November 1, 2018, $11,500 was wired to Amendola's father's Charles Schwab account. Of the $14,500 Samuel Dealey gave Amendola via PayPal on November 26, 2018, $7,000 were wired to Amendola's father's Charles Schwab account. Amendola does not appear to have used the rest of the money Samuel Dealey gave him for its intended purpose. For example, $3,400 was used to make electronic payments to unidentified third parties, $1,500 was transferred to other accounts controlled by Amendola, $4,600 was wired to the owner of the home Amendola was renting, and $19,000 appears to have been converted into cash. I have also reviewed Amendola's father's Charles Schwab account and it shows that Amendola made no deposits to match the deposits made by Samuel Dealey. Moreover, there is no indication that Amendola ever opened an investment account of which Samuel Dealey was an owner.

41.     Before giving Amendola any money, Samuel Dealey established three conditions that Amendola agreed to comply with.  First, Amendola would give Samuel Dealey full, unrestricted access to the trading account.  Second, Amendola could only withdraw funds from the trading account if Samuel Dealey received a simultaneous, equal disbursement.  Finally, the money deposited in the trading account could not be used for purposes other than trading.

42.     Amendola never provided Samuel Dealey with access to the trading account.  At one point, Amendola told Samuel Dealey that he was transferring the account from TD Ameritrade to Interactive Brokers and that he would provide Samuel Dealey the login information after the transfer was completed.  When Amendola finally gave Samuel Dealey the account login information, it did not work.  Based on what Amendola told him, Samuel Dealey also understands that Amendola withdrew funds from the trading account without telling Samuel Dealey and without giving Samuel Dealey simultaneous, equal distributions.

43.     Amendola gave Samuel Dealey a promissory note for $84,000, which Amendola told him represented his $62,500 investment plus profits.  Of this amount, Samuel Dealey has only received $4,500, which Amendola paid him via PayPal. Amendola gave Samuel Dealey a check for around $43,000 in January 2019, but the check was rejected due to insufficient funds.  Amendola continues to tell Samuel Dealey that he is going to pay Samuel Dealey back and told Samuel Dealey that he expects to receive a bonus from his current job.

44.     According to Samuel Dealey, he and Amendola did not memorialize in writing their investment agreement, but the emails and text messages they exchanged

may reflect the essence of their agreement.  Amendola used email address brettamendola@yahoo.com to communicate with Samuel Dealey.

*Stephanie Dosik*

45.     Stephanie Dosik was interviewed by the FBI on June 22, 2020.  She and Amendola dated from October 2018 to December 2018.  In late 2018, Amendola told Stephanie Dosik that he had an "amazing opportunity" for her related to a weed farm located in Maryland. Amendola told Stephanie Dosik that if she lent him $50,000 on a Monday, he would repay her $70,000 by Thursday. Stephanie Dosik understood Amendola needed to borrow $50,000 because he had to demonstrate that he had this much to invest in the farm. Stephanie Dosik also lent Amendola money for a beverage company he said he was starting.  She did not place any restrictions on how Amendola could use the funds she lent him.

46.     Amendola did not repay Stephanie Dosik on time. Amendola told her that he could not pay her back because people who owed him money had not paid him. It took around eighteen months for Stephanie Dosik to receive the money Amendola owed her.  Stephanie Dosik believes Amendola ended up paying her $100,000, consisting of $80,000 Stephanie Dosik lent him plus $20,000 in interest.

47.     Stephanie Dosik received five or six cash payments from Amendola. Stephanie Dosik believes the largest cash payment was $8,000. She also recalls instances when Amendola gave her $500, $1,500, and $5,000.  She was not comfortable accepting cash from Amendola and told him not to give her any more cash after he made the $8,000 cash payment. Stephanie Dosik recalls Amendola telling her not to deposit over $8,000 in cash into her bank account because it would raise red flags.

48.     Stephanie Dosik met Amendola's father, Roger Amendola, through Amendola. Some of the payments Stephanie Dosik received from Amendola were made by Roger and/or through Roger. Amendola said Roger made some payments on his behalf because Amendola's bank had closed his checking account.

49.     The name of Amendola's business is Arca Enterprises (Arca). Stephanie Dosik never learned what Arca did.  Stephanie Dosik wired $30,000 to Arca on December 19, 2018 and then received and deposited a $50,000 from Brevon Developers on December 20, 2018.  She recalled that Amendola personally delivered the $50,000 Brevon Developers check as well as other checks Stephanie Dosik received from Brevon Developers and Roger.  Stephanie Dosik wired $31,000 back to Amendola on December 24, 2018, which Amendola told her was a partial refund of the $50,000 Brevon Developers check. Stephanie Dosik returned the money after Amendola indicated that Brevon Developers did not have enough funds to cover its payroll because of the $50,000 Stephanie Dosik had received. The day Stephanie Dosik sent Amendola the $31,000 wire, Amendola picked her up at her home, drove her to the bank, and gave her the wire instructions.

50.     Records produced by Stephanie Dosik and/or various financial institutions show that Amendola received around $134,550 from Stephanie Dosik and repaid her around $148,300. Transactions included, but were not limited to, the following:

> a.     Stephanie Dosik wired $58,000 to Arca's TD Bank account x2094 on November 15, 2018.  The same day, the withdrawals that posted to Arca's TD Bank account x2094 included a $10,000 check made payable to Earl Burger for a November payment, two wires totaling

$35,000 to Roger's Charles Schwab account x8024, two Venmo payments totaling $1,460, and a $500 cash withdrawal.

b.     Records produced by Hollywood Casino at Charlestown Races indicate that Amendola lost around $2,937 at this casino from November 16, 2018 through November 19, 2018.

c.     Stephanie Dosik wired $13,000 to Arca's TD Bank account x2094 on November 27, 2018.  The same day, the withdrawals that posted to Arca's TD Bank account x2094 included a $10,000 wire to Roger's Charles Schwab account x8024 and a $2,000 withdrawal.

d.     Stephanie Dosik wired $30,000 to Arca's TD Bank account x2094 on December 19, 2018.  The same day, a $7,500 check made payable to PDK Building & Design LLC cleared Arca's TD Bank account x2094. The next day, $29,000 was transferred from Arca's TD Bank account x2094 to Amendola' s TD Bank account x1161, which was followed by a $28,500 transfer from account x1161 to Amendola's TD Bank account x9237.  Withdrawals posting to account x9237 on December 20, 2018 included a $5,000 wire to Jorge Diaz, a $5,700 wire to LAD Marketing Group LLC, and a $16,500 wire to Roger's Interactive Brokers account x6661.

e.     On December 20, 2018, a $50,000 check made payable to Stephanie Dosik cleared Brevon Developers' WFB account x3156. The balance of account x3156 after this check cleared was negative $47,220.

f.     Stephanie Dosik wired $31,000 to Amendola's TD Bank account x1161 on December 24, 2018, On December 26, 2018, the withdrawals that posted to TD Bank account x1161 included a $6,000 wire to LAD Marketing Group LLC and an $18,000 wire to Roger's Interactive Brokers account x6661.

g.     On July 24, 2019, the withdrawals that posted to Arca's WFB account x8851 included a $2,000 check made payable to Stephanie Dosik, a $5,800 check made payable to the Wall Street Fusion Group, a $1,000 wire to TMC Partners LP, a $2,500 wire to Jorge Diaz, and a $1,700 check made payable to Sam Grant.  The funds used for these payments appear to have come from Domenick Alario.  From July 22, 2019 through July 24, 2019, around $36,669 in Square Inc. deposits related to Domenick Alario posted to Roger's WFB account x5191. Transfers from account x5191 to Arca's WFB account x8851 immediately following the Square Inc. deposits totaled around $33,500.

h.     On September 13, 2019, the withdrawals that posted to Arca's WFB account x8851 included a $2,000 check made payable to Stephanie Dosik, a $1,500 check payment on the $93,000 loan M&T Bank issued in 2017 to Roger and Ignite Beverage Inc. for the purchase of Amendola's 2017 Porsche Panamera, and a $2,000 transfer to Roger's WFB account x5191. These payments were made the day after account x8851 received an $8,000 wire from Austin Jacobs

and the same day that account x8851 received a $12,700 wire from Daniel Coyle.

i.      On September 19, 2019, the withdrawals that posted to Arca's WFB account x8851 included a $2,500 check made payable to Stephanie Dosik and a $5,000 check made payable to Domenick Alario.  These payments were made the same day that account x8851 received an $8,000 wire from Daniel Coyle.

j.      On September 25, 2019, the withdrawals that posted to Arca's WFB account x8851 included a $5,000 check made payable to Stephanie Dosik.  This payment was made the same day that account x8851 received two wires totaling $7,500 from Thomas Coyle.

k.      On October 24, 2019, a $1,000 transfer was made from Arca's WFB account x8851 to Roger's WFB account x5191. The same day, a $1,000 Zelle payment was sent to Stephanie Dosik from account x5191.

*Domenick Alario*

51.     The FBI interviewed Domenick Alario on May 6, 2020.  He met Amendola through his neighbor, Denise Watts, after he agreed to help Denise Watts with the mapping of a new hemp farm that she was working with Amendola.  Domenick Alario understood that Amendola was the person in charge of the farm and who oversaw the whole project.  United Canna, Amendola's company, was the business behind the farm.

52.     One day, Domenick Alario was with Amendola and Denise Watts when they started talking about the farm needing cash to get through the next thirty days. After Amendola explained that the farm was short on cash because the investors who

were going to provide the funding were a little delayed, Domenick Alario offered to make a short-term loan so that the project could continue moving forward while the investors' funding came through.

53.     Domenick Alario lent United Canna more than $50,000. The funds for the loan came from Domenick Alario's American Express ("AmEx") card.  Part of the loan was in the form of equipment that Domenick Alario bought for the farm with the card. Domenick Alario gave his credit card information to Roger, who then ran charges on the card to access cash.

54.     Amendola never told Domenick Alario exactly what he was going to do with the money that Domenick Alario lent him.  However, based on what Amendola told him, Domenick Alario understood that the loan was a business loan that would be used for expenses directly related to the farm.  Domenick Alario agreed to make the loan because he understood that the funds were needed to maintain the farm's operations and because Amendola said the loan would be repaid in thirty days, when the investors' money came through.

55.     Domenick Alario believes he started getting payments from Amendola after around sixty days.  Domenick Alario understood that Amendola did not repay him after thirty days because the investors' money did not come through.  Domenick Alario estimated that Amendola has repaid around sixty percent of the total Domenick Alario lent him.

56.     Domenick Alario produced a promissory note dated July 15, 2019, that appears to have been executed by him and Amendola on July 24, 2019.  It indicates that the borrower, Amendola and United Canna Corp LLC, would pay $57,500 plus $10,000 interest to the lender, Domenick Alario, on August 15, 2019.

57.     Records produced by Domenick Alario and/or various financial institutions show that in July 2019, charges made to Domenick Alario's AmEx card by Roger's business, Brevon Developers, totaled around $52,583.  According to Domenick Alario's records, Amendola ended up owing him around $68,069, which consisted of around $57,555 in principal, returned check fees of $14, interest of $10,000, and a $500 late payment charge.  Between August 21, 2019 and October 15, 2019, Domenick Alario received payments totaling around $38,500 from Amendola.  The transactions involving Domenick Alario included, but were not limited to, the following:

a.      On July 19, 2019 and July 20, 2019, two Square Inc. charges totaling around $19,155 were made to Domenick Alario's AmEx card by Brevon Developers.  The proceeds from these charges, less fees, appear to have resulted in deposits totaling around $18,484 to Roger's WFB account x5191 on July 22, 2019.  The same day, the withdrawals that posted to WFB account x5191 included cash withdrawals totaling $2,300 and transfers totaling $18,500 to Arca's WFB account x8851. The withdrawals that posted to account x8851 on July 22, 2019, included a $5,500 check made payable to Jeffrey Boogaard, a $3,150 check made payable to Clyde Kessler, four cash withdrawals totaling $2,700, and $900 transferred back to Roger's WFB account x5191.

b.      On July 22, 2019, a Square Inc. charge of $8,900 was made to Domenick Alario's AmEx card by Brevon Developers.  This charge appears to have resulted in a deposit of around $8,588 to Roger's WFB account x5191 on July 23, 2019.  The same day, the

withdrawals that posted to WFB account x5191 included a $600 cash withdrawal and a $7,500 transfer to Arca's WFB account x8851. The withdrawals that posted to account x8851 on July 23, 2019, included cash withdrawals totaling $1,800.

c.     On July 23, 2019, a Square Inc. charge of $9,945 was made to Domenick Alario's AmEx card by Brevon Developers.  This charge appears to have been part of a $10,368.62 deposit to Roger's WFB account x5191 on July 24, 2019.  The same day, the withdrawals that posted to WFB account x5191 included a $1,600 cash withdrawal and a $7,500 transfer to Arca's WFB account x8851. The withdrawals that posted to account x8851 on July 24, 2019, included a $300 cash withdrawal, a $5,800 check made payable to the Wall Street Fusion Group, a $1,000 wire to TMC Partners LP, a $2,500 wire to Jorge Diaz, and a $2,000 check made payable to Stephanie Dosik.

d.     On July 24, 2019, a Square Inc. charge of $9,650 was made to Domenick Alario's AmEx card by Brevon Developers.  This charge appears to have resulted in a deposit of around $9,312 to Roger's WFB account x5191 on July 25, 2019.  The same day, the withdrawals that posted to WFB account x5191 included cash withdrawals totaling $5,800 and a $7,000 transfer to Arca's WFB account x8851.  The withdrawals that posted to account x8851 on July 25, 2019, included cash withdrawals totaling $2,300 and a $3,750 check made payable to Clyde Kessler.

e.  On July 29, 2019, a Square Inc. charge of $4,933 was made to Domenick Alario's AmEx card by Brevon Developers.  This charge appears to have resulted in a deposit of around $4,760 to Roger's WFB account x5191 on July 30, 2019.  The same day, the withdrawals that posted to WFB account x5191 included a $4,500 transfer to Arca's WFB account x8851.  The withdrawals that posted to account x8851 on July 30, 2019, included a $300 cash withdrawal and a $2,970 check made payable to Randy Peyton.

f.  On August 29, 2019, a $2,500 cashier's check purchased by Daniel Coyle, containing the memo "LOAN #1 + CASH $4000," was deposited into Arca's WFB account x8851.  The next day, a $5,000 wire was sent from WFB account x8851 to Domenick Alario's business, Bim4sites LLC.

g.  A $5,000 check made payable to Domenick Alario cleared Arca's WFB account x8851 on September 19, 2019, which was the same day that an $8,000 wire from Daniel Coyle posted to the account.

h.  A $3,000 check made payable to Domenick Alario cleared Arca's WFB account x8851 on October 3, 2019, which was the same day that a $2,000 wire from Thomas Coyle's business posted to the account.

i.  On October 15, 2019, a $21,000 check from the Wall Street Fusion Group that was made payable to Roger was deposited into Roger's WFB account x5191.  The same day, the withdrawals that posted to WFB account x5191 included a $4,000 check made payable to

Thomas Coyle and a $4,150 transfer to Arca's WFB account x8851. The withdrawals that posted to account x8851 on October 15, 2019, included a $4,010 cash withdrawal that appears to match a $4,000 payment that Domenick Alario reported receiving that day in the form of a cashier's check.

### Daniel Coyle

58.     Daniel Coyle was interviewed by the FBI on May 28, 2020, and June 9, 2020.  He met Amendola two or three years ago through Amendola's sister. Around late August 2019, Amendola told Daniel Coyle about United Canna, an industrial hemp company/farm Amendola owned with his father, Roger Amendola.  Amendola claimed that United Canna had no debt or other investors/owners.  He said that United Canna had a contract in place to sell its hemp after it was harvested, but it needed money to complete the harvest and go to market.  Amendola also said Roger Amendola had put $150,000 of his own money into United Canna but that they needed additional funds to pay for harvest-related expenses.

59.     Amendola initially offered to pay Daniel Coyle $75,000 after the hemp was harvested in return for a $50,000 loan.  Later, Amendola offered Daniel Coyle a forty percent ownership interest in United Canna in addition to the $25,000 profit. Amendola drafted a contract, which was notarized, that contained the specifics of the agreement.  The parties involved in the contract were Daniel Coyle, Amendola, Roger Amendola, United Canna, and another business Amendola owned named Arca.  Daniel Coyle ended up lending Amendola/United Canna over $50,000, possibly $5,000 to $10,000 more. Amendola has repaid around $2,800.

60.     Based on his discussions with Amendola, it was clear to Daniel Coyle that the money he lent Amendola/United Canna was only to be spent on United Canna-related harvest and marketing expenses.  Additionally, Amendola told Daniel Coyle that United Canna had no debt and therefore the money Daniel Coyle lent Amendola/United Canna was not to be used to repay debt.

61.     Daniel Coyle asked Amendola for access to United Canna's WFB account, but Amendola said he could not grant them access because Roger maintained other unrelated accounts at WFB that Amendola did not want Daniel Coyle to see.

62.     Amendola never said anything regarding any concerns related to the health or condition of United Canna's hemp plants.  Amendola would regularly say that he found a buyer for United Canna's hemp and that he would be repaying Daniel Coyle.

63.     Daniel Coyle produced an operating agreement for United Canna executed and notarized on September 19, 2019.  The members of United Canna are identified as Roger Amendola, with a sixty-percent ownership interest and Daniel Coyle, with a forty-percent ownership interest. Attachment A to the agreement indicates Roger's initial contribution to United Canna was $150,000 in cash.

64.     Transactions related to the Daniel Coyle included, but were not limited to, the following:

　　　　　　　　a.     On or around August 29, 2019, Daniel Coyle gave Amendola $6,500, which included a cashier's check with the memo "LOAN #1 + CASH $4000" that was deposited in Arca's WFB account x8851. The withdrawals that posted to account x8851 on August 30, 2019 included a $5,000 wire to Domenick Alario's business.

b.      A $7,800 wire originated by Daniel Coyle's brother, Thomas Coyle, posted to Arca's WFB account x8851 on September 5, 2019.  The same day, the withdrawals that posted to account x8851 included a $500 Zelle payment to Saundra Vass, a $500 transfer to Roger's WFB account x1547, and a $300 cash withdrawal.

c.      A $12,700 wire originated by Daniel Coyle posted to Arca's WFB account x8851 on September 13, 2019.  The same day, the withdrawals that posted to Arca's WFB account x8851 included a $2,000 transfer to Roger's WFB account x5191, a $2,000 check made payable to Stephanie Dosik, a $3,000 check made payable to Evonne Spiewak, and a $1,500 check payment on the $93,000 loan M&T Bank issued in 2017 to Roger and Ignite Beverage Inc. for the purchase of Amendola's 2017 Porsche Panamera.

d.      An $8,000 wire originated by Daniel Coyle posted to Arca's WFB account x8851 on September 19, 2019.  The same day, the withdrawals that posted to Arca's WFB account x8851 included a $5,000 check made payable to Domenick Alario, a $2,500 check made payable to Stephanie Dosik, and a $300 cash withdrawal.

e.      On September 25, 2019, two wires totaling $7,500, originated by Thomas Coyle and Daniel Coyle, posted to Arca's WFB account x8851.  The same day, the withdrawals that posted to Arca's WFB account x8851 included a $5,000 check made payable to Stephanie Dosik.

f.      Deposits to Arca's WFB account x8851 from October 2, 2019, to

October 4, 2019, totaled around $21,300 and included three wires

totaling $17,000 originated by Thomas Coyle, two transfers from

Roger-controlled accounts totaling $3,800, and a $500 cash

deposit.  During this time, the withdrawals that posted to Arca's

WFB account x8851 included a $10,898 cash withdrawal, a $3,000

check made payable to Domenick Alario, Zelle payments of $500 to

Jorge Diaz and Chris Elardo, and a $1,218.99 Best Buy transaction.

*Austin Jacobs*

65.      Austin Jacobs was interviewed by the FBI on January 14, 2020, and April

30, 2020.  He met Amendola around July or August 2019, and they visited Amendola's

farm.  At the time, the hemp plants Amendola was growing on the farm were around five

feet high.

66.      Amendola said he had been working on a hemp-growing deal in the

Poconos but the deal did not pan out and he was now trying to use the money he had

secured for the Poconos project for a hemp/CBD project in Virginia.  Amendola also

explained that United Canna was owned by him and his father, Roger Amendola, but

that it was in Roger's name because of Amendola's criminal record.  Amendola also said

during the meeting that United Canna did not have any debt or any other investors and

that he was searching for a short term investor who could also help with United Canna's

branding and sales.

67.      Amendola initially offered Austin Jacobs a forty-nine percent ownership

interest in United Canna in return for a $50,000 loan, but they ended up settling on a

$25,000 loan for a ten or fifteen percent ownership interest.  Austin Jacobs gave

Amendola $8,000 or $9,000 the day they met at the farm, and he agreed to provide additional financing to United Canna, up to $25,000, as it was needed.

68.     Sometime after the meeting at the farm, Austin Jacobs met with Amendola and Roger, and they gave him a promissory note indicating that he would be paid back around $30,000. Amendola and Roger also gave Austin Jacobs documentation granting him the agreed-upon ownership interest in United Canna, as well as records showing that Amendola and Roger had themselves invested $150,000 in the business. When Austin Jacobs reviewed the paperwork, he noticed it had someone else's name on it instead of his name.  When Austin Jacobs asked Amendola about the name in the paperwork, Amendola explained that he found another investor because Austin Jacobs had been dragging his feet and that he no longer needed Austin Jacobs's investment but was willing to go ahead with the deal because of the money Austin Jacobs had already given Amendola.

69.     On August 29, 2019, Amendola emailed Austin Jacobs a Limited Liability Company (LLC) agreement for United Canna. The agreement identified United Canna's members as Roger, with a fifty-one percent ownership interest and a $125,000 cash contribution, Austin Jacobs, with a twenty-five percent ownership interest and a $50,000 cash contribution, and Jesse Martin, with a twenty-four percent ownership interest.

70.     On September 11, 2019, an email was sent from Roger's email account to Amendola containing two attachments.  One attachment was an unsigned LLC agreement for United Canna that identified United Canna's members as Roger, with an eighty-five ownership interest, and Daniel Coyle, with a fifteen percent ownership interest.  The LLC agreement contained an attachment that listed Roger and Austin

Jacobs as the United Canna members. It also stated that Roger's contribution was $150,000 and Austin Jacobs's contribution was $25,000. The second attachment was an unsigned $25,000 promissory note that identified Jacobs as the lender and Amendola, Roger, and Arca Enterprises as the borrowers.

71.     Austin Jacobs produced signed copies of the United Canna LLC agreement and promissory note that were emailed from Roger's email account on September 11, 2019. The documents appear to have been executed on September 11, 2019. On page two of the LLC agreement, where the LLC members are identified, Daniel Coyle's name was crossed out and replaced with Austin Jacobs's name.

72.     Records produced by Austin Jacobs or by various financial institutions show that Amendola received around $25,000 from Austin Jacobs and repaid him around $3,500. Transactions related to Austin Jacobs included, but were not limited to, the following:

      a.     On September 12, 2019, an $8,000 wire originated by Austin Jacobs posted to Arca's WFB account x8851. The same day, the withdrawals that posted to Arca's WFB account x8851 included a $300 Zelle payment to Nico Mastrangelo, a $500 Zelle payment to Saundra Vass, and cash withdrawals totaling around $2,800.

      b.     On September 18, 2019, a $5,000 wire originated by Austin Jacobs posted to Arca's WFB account x8851. The same day, the withdrawals that posted to Arca's WFB account x8851 included Zelle payments to Nico Mastrangelo totaling $2,000, a $1,000 Zelle payment to Jorge Diaz, and a $1,000 transfer to Roger's WFB account x5191.

c.  A $2,500 check made payable to Austin Jacobs cleared Roger's BB&T account x5303 on October 3, 2019.

*Jason Goldsberry*

73.  Jason Goldsberry was interviewed by the FBI on June 10, 2020.  He met Amendola in 2018.  In October 2018, Jason Goldsberry made a $20,000 wire transfer to a business related to Amendola.  The money was supposed to be invested in the stock market and/or a hedge fund.  Jason Goldsberry wired Amendola the money after Amendola said the investment would generate $10,000 in profits and that he would repay Jason Goldsberry $30,000.  Amendola gave Jason Goldsberry a promissory note related to the $20,000 investment.  Jason Goldsberry understood that he was part of a group of people who gave Amendola money to invest.

74.  Amendola did not repay Jason Goldsberry by the agreed-upon date.  Jason Goldsberry believes that Amendola started paying him back around January 2019.  Amendola used a combination of cash and checks to pay Jason Goldsberry a total of $27,500 in multiple installments during 2019. Amendola told Jason Goldsberry that he borrowed money from his father in order to repay Jason Goldsberry.

75.  The promissory note Amendola gave Jason Goldsberry was dated October 1, 2018 and was due December 31, 2018.  It identified Arca Enterprises as the borrower and Jason Goldsberry as the lender and was signed by Amendola and Jason Goldsberry. The note states that the borrower would pay the lender "$20,000 with interest from October 1, 2018, on the unpaid principal at the rate of 50% per annum."

76.  Transactions related to Jason Goldsberry included, but were not limited to, the following:

a.    On October 1, 2018, a $20,000 wire originated by Jason Goldsberry posted to Arca's TD Bank account x2094. The same day, withdrawals that posted to Arca's TD Bank account x2094 included Venmo payments totaling $2,000 and a $1,497.91 check made out to M&T Bank related to the loan of around $93,000 that M&T Bank issued in 2017 for the purchase of Amendola's Porsche Panamera.

b.    Records for Arca's SunTrust Bank account x7726 show that check number 98, dated January 15, 2019, was made payable to Jason Goldsberry in the amount of $30,000 but never cleared the account.

c.    On January 23, 2019, Amendola sent Jason Goldsberry a text message indicating he had just sent Jason Goldsberry a "chunk of cash" via FedEx. Amendola sent this text in response to a text Jason Goldsberry sent him, stating, "Brett your check bounced. Now I am really fucking irritated. Bring me a cashier's check today." Records produced by WFB show that on the day these messages were exchanged, a $14,000 check made out to Amendola cleared Samuel Dealey's company's WFB account x6496.  The check appears to have been endorsed and cashed by Amendola.

*David Baker, et al.*

77.    Emails exchanged by Amendola show he entered into an investment agreement with, and received funds from, David Baker and entities associated with him, Jorge Diaz, and Earl Burger.

78.     In an October 2, 2018, email that Amendola sent to David Baker, Amendola said, "I know that we came to a basic understanding and agreement on how we can begin working together and mutually benefitting from my skills and David's access to capital . . . here is what I understand our agreement to be . . . [David Baker' company] will provide a short term loan to my company, ARCA Enterprises, Inc. The principal amount will be $35,000 . . . I will pay monthly interest of 20% or $7,000 on the first of each month (manner of interest payments to be determined), and annualized APR of 240%. At the end of the term, which will be December 31, 2018, ARCA Enterprises will pay off the note by making a lump sum payment of the full principal amount ($35,000.00) . . . ."  Amendola did not do perform as represented.

79.     Records produced by various financial institutions show that from October 9, 2018, to January 9, 2019, Amendola received around $114,000 from David Baker and entities associated with him, Jorge Diaz, and Earl Burger.  The records also show that from November 13, 2018, to December 31, 2019, Amendola issued payments to them totaling around $77,760.  These financial transactions included the following:

a.     On October 9, 2018, a $35,000 cashier's check purchased by Jorge Diaz was deposited/posted to Arca's TD Bank account x2094, which prior to this deposit had a balance of around $8.54.  The next deposit made to the account was a $4,600 deposit on October 16, 2018.  Withdrawals that posted to the account from October 9, 2018, to October 15, 2018, included a $15,000 transfer to Roger's Charles Schwab account x8024, a payment of $1,704.60 to Dominion Energy, and a $5,500 check made payable to Roger's company, Brevon Developers.

b. On October 18, 2018, an $18,000 transfer was made from Earl Burger's TD Bank account to Arca's TD Bank account x2094.  The same day, $16,000 was wired from Arca's TD Bank account x2094 to Roger's Charles Schwab account x8024.

c. On November 15, 2018, the same day that a $58,000 wire from Stephanie Dosik posted to Arca's TD Bank account x2094, a $10,000 check made payable to Earl Burger with a memo indicating it was for the November payment cleared Arca's TD Bank account x2094.

d. On November 23, 2018, a $13,000 transfer was made from Earl Burger's TD Bank account to Arca's TD Bank account x2094.  The same day, the withdrawals that posted to Arca's TD Bank account x2094 included a $7,000 check made payable to cash that appears to have been endorsed/cashed by Amendola and a $4,112.99 ATM transaction at the Hollywood Casino at Charles Town Races.

e. On December 19, 2018, the same day that a $30,000 wire from Stephanie Dosik posted to Arca's TD Bank account x2094, a $7,500 check made payable to an entity associated with David Baker, cleared Arca's TD Bank account x2094.  The next day, $29,000 were transferred from Arca's TD Bank account x2094 to Amendola's TD Bank account x1161 followed by a $28,500 transfer from Amendola's TD Bank account x1161 to Amendola' s TD Bank account x9237.  Withdrawals posting to Amendola's TD Bank account x9237 on December 20, 2018, included a $5,000 wire to

Jorge Diaz, a $5,700 wire to LAD Marketing Group LLC, and a $16,500 wire to Roger's Interactive Brokers account x6661.

f.    Three wires totaling $38,000, originated by Jorge Diaz and an entity associated with David Baker posted to Arca's SunTrust account x7726 on from January 7, 2019, to January 9, 2019.  The withdrawals that posted to Arca's SunTrust account x7726 on January 9, 2019, and January 10, 2019, included a $27,500 wire to Roger's Interactive Brokers account x6661 and cash withdrawals totaling $10,300.

g.    A $2,000 wire to Jorge Diaz posted to Arca's WFB account x8851 on June 14, 2019, the same day that an incoming $9,500 wire originated by Jeffrey Boogaard posted to the account.

h.    Withdrawals from Arca's WFB account x8851 on July 24, 2019, included a $1,000 wire to TMC Partners LP, a $2,500 wire to Jorge Diaz, a $2,000 check made payable to Stephanie Dosik, a $5,800 check made payable to the Wall Street Fusion Group, and a $1,700 check made payable to Sam Grant.  The funds used for these payments appear to have come from Domenick Alario.  From July 22, 2019, through July 24, 2019, around $36,669 in Square Inc. deposits related to Domenick Alario posted to Roger's WFB account x5191.  Immediately following the Square Inc. deposits, there were transfers of around $33,500 from Roger's WFB account x5191 to Arca's WFB account x8851.

i.  A $500 Zelle payment to Saundra Vass, believed to be related to Jorge Diaz, was made from Arca's WFB account x8851 on September 5, 2019, the same day that a $7,800 wire originated by Thomas Coyle posted to the account.  Other withdrawals that posted to account x8851 that day included a $500 transfer to Roger's WFB account 8715071547 and a $300 cash withdrawal.

j.  Another $500 Zelle payment to Saundra Vass was made from Arca's WFB account x8851 on September 12, 2019, the same day that an $8,000 wire originated by Austin Jacobs posted to the account.  Other withdrawals that posted to Arca's WFB account x8851 that day included a $300 Zelle payment to Nico Mastrangelo and cash withdrawals totaling around $2,800.

k.  A $500 Zelle payment to Jorge Diaz was made from Arca's WFB account x8851 on September 18, 2019, the same day that a $5,000 wire originated by Austin Jacobs posted to the account.  Other withdrawals that posted to Arca's WFB account x8851 that day included Zelle payments to Nico Mastrangelo totaling $2,000 and a $1,000 transfer to Roger's WFB account x5191.

l.  Another $500 Zelle payment to Jorge Diaz was made from Arca's WFB account x8851 on October 2, 2019, the same day that a $7,500 wire originated by Thomas Coyle posted to the account.  Other withdrawals that posted to Arca's WFB account x8851 that day included a $500 Zelle payment to Chris Elardo and a $1,218.99 transaction at Best Buy.

m.   A $1,000 Zelle payment to Jorge Diaz posted to Arca's WFB account x8851 on October 15, 2019, the same day that a $21,000 check from the Wall Street Fusion Group was deposited into Roger's WFB account x5191 and $4,299 was transferred from Roger's WFB account x5191 to Arca's WFB account x8851. Other withdrawals that posted the same day included a $4,000 check made payable to Thomas Coyle from Roger's WFB account x5191 and a $4,010 withdrawal from Arca's WFB account x8851 that appears to match a $4,000 payment that Domenick Alario received that day in the form of a cashier's check.

*Paul Apostolopoulos*

80.   Starting on April 16, 2018, Amendola sent Paul Apostolopoulos a series of emails regarding borrowing money from various persons, using the money to trade securities and buy real estate properties, and using the profits from trading and the rental income to repay the loans plus a return on investment for the lenders.

81.   On April 19, 2018, Amendola sent an email to Paul Apostolopoulos stating, in part:

> I wanted to memorialize the terms of understanding so that we can perform for [an investor] and his associates. If you get a check for $50,000.00 this evening (make it payable to yourself or one of your companies). The funds will most likely not be made available until Friday or Monday . . . We can agree to return 50% or $25,000.00 tax-free profits to the lender over a 90-day period. We have the capacity to provide weekly payments, bi-weekly, or monthly payments, just ask the investor how he wants it broken down. Payment Option #1: $6,250/weekly for 12 weeks = $75,000 Payment Option #2: $12,500/every 2 weeks for 3 months = $75,000 Payment Option #3: $25,000 on the 1st of every month for 3 months = $75,000 Lastly, as per our agreement, we can immediately pay [the investor] a facilitation fee of $7,500.00 for his efforts on our behalf. In order for this to even make sense or be feasible, funds must be in your

possession by tomorrow (Thursday April 26th if by check) or Friday by 5:00pm (if by cash of wire). If you and [the investor] can get this done by tomorrow, I will also agree to begin transferring funds into a business account next week (May 1st) for the sole purposes of acquiring real estate and rental properties.

82.     Records produced by various financial institutions show that from March 22, 2018, to February 24, 2019, Amendola received around $14,100 from Paul Apostolopoulos and sent him around $18,700. These financial transactions included the following:

> a.     On May 3, 2018, a $6,000 wire originated by Paul Apostolopoulos posted to Amendola's United Bank account x0149, which had a balance of around $6 prior to the deposit. The same day, a $2,000 check made out to cash posted to Amendola's United Bank account x0149. A $995 payment to Dominion Power posted to the account on May 7, 2018.

> b.     On May 10, 2018, a $3,900 wire originated by Paul Apostolopoulos posted to Amendola's United Bank account x0149, which had a balance of around $684 prior to the deposit. On May 14, 2019, a $2,600 check made out to cash posted to Amendola's United Bank account x0149, which was left with a balance of around $339 at the end of the business day.

> c.     On June 1, 2018, a $2,700 wire originated by Paul Apostolopoulos posted to Amendola's United Bank account x0149, which had a balance of around $117 prior to the deposit. The same day, a $2,995.82 check made payable to M&T Bank cleared Amendola's

United Bank account x0149, which was left with a balance of around $212 at the end of the business day.

d.   On August 9, 2018, a $1,500 wire originated by Paul Apostolopoulos posted to Amendola's United Bank account x0149. The same day, Amendola withdrew $2,500 from Amendola's United Bank account x0149 and a check made payable to M&T Bank in the amount of $2,608.17, drawn on the same account, was returned unpaid.

e.   On September 13, 2018, Arca's TD Bank account x2094 received a $10,000 wire from LAD Marketing Group LLC.  The same day, a $3,000 transfer to Paul Apostolopoulos was made from the account.

*LAD Marketing Group LLC*

83.   On September 10, 2018, Amendola sent a LAD Marketing Group LLC representative an email saying:

> The objective of your investment is to build capital, and seek high returns via the trading of options utilizing the straddles I have incorporated in my previous trading. It is mutually understood that there is a high degree of risk associated with trading options, but given the minimal investment, I have agreed to guarantee the principal in full ($10,000.00). It is also mutually understood that my previous success does not guarantee future results. We mutually understand and agree that the first One Hundred Thousand Dollars ($100,000.00) in profits will not be subject to taxation. Any and all profits above the aforementioned amount will be subject to tax withholdings of 35% of profits.

84.   Financial institution records show:

a.   Arca's TD Bank account x2094 received a $10,000 wire from LAD Marketing Group LLC on September 13, 2018.  The same day, a

$3,000 transfer to Paul Apostolopoulos was made from Arca's TD Bank account x2094. The next day, a point-of-sale withdrawal of $1,354.95 was made from Arca's TD Bank account x2094 at the Charles Town Races Casino.

b.      A $5,700 wire was sent from Amendola's TD Bank account x9237 to LAD Marketing Group LLC on December 20, 2018, which was the day after Amendola received a $30,000 wire from Stephanie Dosik.

c.      On December 26, 2018, a $6,000 wire was sent from Amendola's TD Bank account x1161 to LAD Marketing Group LLC. This was two days after Stephanie Dosik wired $31,000 into Amendola's TD Bank account x1161.

### THE PAYCHECK PROTECTION PROGRAM

85.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in  March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").  In April 2020, Congress authorized over $300 billion in additional PPP funding.

86.      In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business.  The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to

be eligible to obtain the PPP loan.  In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

87.     A PPP loan application must be processed by a participating financial institution (the lender).  If a PPP loan application is approved, the participating financial institution funds the PPP loan using its own monies, which are 100% guaranteed by Small Business Administration (SBA).  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

88.     PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.  The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time (usually eight weeks of receiving the proceeds) and uses at least 75% of the PPP loan proceeds on payroll expenses.

89.     As discussed below, after the CARES Act was signed into law and the Paycheck Protection Program was created in March 2020, United Canna LLC obtained SBA-backed PPP loan of around $43,292 (loan number x7802).  Based on the records and information obtained and examined throughout this investigation, I understand the approval and subsequent funding of this loan was based on false information provided

to the loan originator, Square Inc., d/b/a Square Capital LLC, and by extension, to the lender Square Capital partnered with to offer PPP loans, Celtic Bank, an SBA 7(a) lender and FDIC-insured financial institution.

90.     Records and data produced by United Canna's PPP loan originator identify Amendola's father, Roger Amendola, as the loan applicant and also as the individual associated with United Canna's Square Inc. account.  This information is contradicted by the fact that the only email address linked to United Canna's Square Inc. account and PPP loan is brettamendola@yahoo.com, which belongs to Amendola.  Additionally, the telephone number linked to United Canna's Square Inc. account, xxx-xxx-2226, also belongs to Amendola, while the telephone number linked to United Canna's PPP loan is associated with Brevon Developers Inc., Roger Amendola's business.

91.     Roger Amendola's ownership of United Canna is also contradicted by the information provided by several of the victims previously identified in this affidavit, including Domenick Alario, Austin Jacobs, and Daniel Coyle, who advised that their interactions related to United Canna LLC and/or United Canna Corp LLC were with Amendola and that Roger may have played a limited role in the business but did not appear to have decision-making authority over the business.  For example, Austin Jacobs advised that Amendola told him that United Canna was in Roger Amendola's name because of Amendola's criminal record but was really owned by Amendola and Roger Amendola.  Domenick Alario advised that he did not know if anyone helped Amendola run United Canna and/or the United Canna's farm, and that he understood that Amendola was the person in charge of the farm, the one who oversaw the whole project, and the one "at the top of the food chain."  Alario further advised that he

believes he only saw Roger Amendola at the farm one time and that he does not know what role, if any, Roger had in the farm's operations.

92.     To apply and obtain United Canna's PPP loan, the applicant submitted to the loan originator, and by extension to the lender, copies of an IRS Form 941 (Employer's Quarterly Federal Tax Return) for the first quarter of 2020  and of a 2019 IRS Form 940 (Employer's Annual Federal Unemployment Tax Return).  These tax returns indicate that United Canna's payments to employees totaled $47,000 during the first quarter of 2020 and $179,210 in 2019.

93.     The wages reported in these tax returns are not supported by the bank account statements for United Canna's PNC Bank account x2903, which were also submitted with the PPP loan application.  The statements show that account x2903 was opened around January 13, 2020, and had withdrawals totaling around $10,307 in January 2020 and $13,882 in February 2020.  I have also obtained and examined numerous bank accounts associated with Amendola and/or Roger Amendola and have only identified one additional account associated with United Canna LLC - Wells Fargo Bank account x5492, which was opened in October 2019 and appears to have been closed on January 13, 2020.  The activity reported on the statements for account x5492 consisted only of a $50 deposit, a $50 transfer to a Visa account, around $3,644 in net transfers from Arca Enterprises' Well Fargo account x8851, and three checks totaling around $3,644.  In my examination of the other bank accounts associated with and/or controlled by Amendola and/or Roger Amendola, I also found no evidence that United Canna, or any business owned or controlled by Amendola and/or Roger Amendola, paid the wages reported in the tax returns submitted with United Canna's PPP loan application.

94.     The PPP loan originator also produced data and audio recordings for three telephone calls made on May 29 and June 1, 2020, related to United Canna's PPP loan. The telephone number associated with the three calls was Amendola's telephone number, xxx-xxx-2226.  The customer on the calls identified himself as Roger Amendola and indicated that the email associated with the account is brettamendola@yahoo.com. In all three calls, the customer requested an update on the status of the PPP loan and indicated that United Canna's payroll was due on June 1, 2020.  I compared the voice of the customer in these three calls to the voice of the customer in the previously-described SunTrust Bank telephone calls (paragraph 24 above), who identified himself as Amendola, and the voice in all of the recordings appears to belong to the same person.

95.     The records and data produced by the PPP loan originator also show that the applicant provided answers to the following questions, among others, as part of the loan application process:

    a.      "Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, or on propagation or parole?"  The answer provided to this question was "No," even though in November 2019, Amendola was arrested for violating his conditions of supervised release after he was arrested and charged in New Jersey with possession with intent to distribute marijuana.

    b.      "Within the last 5 years, for any felony, has the Applicant (if an individual) or any owner of the Applicant 1) been convicted; 2)

-45-

pleaded guilty; 3) pleaded nolo contendere; 4) been placed on pretrial diversion or 5) been placed on any form of parole or probation (including probation before judgement)?"  The answer provided to this question was "No," even though Amendola was released from prison and placed on supervised release in October 2017.

c.  "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with any other business?  If yes, list all such businesses and describe the relationship in the box below."  The answer provided to this question was "No," even though Amendola and Roger Amendola both own and have common management with other businesses.

COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

96.  As described above and in Attachment B, this application seeks permission to search for records that might be found on the premises, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

97.  *Probable cause*.  I submit that if a computer or storage medium is found on the premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even

years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media— in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

-47-

      e.     Based on actual inspection of other evidence related to this investigation, including emails and financial records, I am aware that computer equipment was used to generate, store, and print documents used in the *Ponzi* scheme.  There is reason to believe that there is a computer system currently located on the premises.

98.    *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the premises because:

      a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or

electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is

possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

99.      *Necessity of seizing or copying entire computers or storage media*.  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.      *The time required for an examination*. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      *Technical requirements*.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      *Variety of forms of electronic media*.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

100.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

BIOMETRIC SECURITY MEASURES

101.   I know from my training and experience, as well as from information found in publicly available materials, that some electronic devices such as mobile telephones and tablets offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password.  This feature is called "Fingerprint Recognition." Some devices similarly allow their users to unlock the device through exposure of the user's face to the device's camera. This feature is called "Facial Recognition."

102.   If a user enables Fingerprint Recognition on a given device, he or she can register up to five fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Fingerprint Recognition sensor.  Similarly, if a user enables Facial Recognition on a device, the user allows the device to capture the user's facial likeness via the device's camera, which is then stored on the device.  The user can then unlock the device in the future by exposing the user's face to the device's camera.  In my training and experience, users of devices that offer Fingerprint Recognition and/or

Facial Recognition often enable one of both features because they are considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

103.    In some circumstances, a fingerprint cannot be used to unlock a device that has Fingerprint Recognition enabled (and, analogously, a facial likeness cannot be used to unlock a device that has Facial Recognition enabled), and a passcode or password must be used instead.  These circumstances include: (1) when more than a certain period of time has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Fingerprint Recognition or Facial Recognition in a certain number of hours and the passcode or password has not been entered in a certain number of days.  Thus, in the event law enforcement encounters a locked device, the opportunity to unlock the device via Fingerprint Recognition or Facial Recognition exists only for a short time.  Fingerprint Recognition and Facial Recognition also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) a certain number of unsuccessful attempts to unlock the device via Fingerprint Recognition or Facial Recognition are made.

104.    The passcode or password that would unlock any devices to be found on the premises to be searched are not known to law enforcement.  Thus, it will likely be necessary to press the finger(s) of the user(s) of the device(s) found during the search of the premises to the device's Fingerprint Recognition sensor, or to expose the user(s)' facial likenesses to the camera of the device(s), in an attempt to unlock the device(s) for

the purpose of executing the search authorized by this warrant.  Attempting to unlock the relevant device(s) via Fingerprint Recognition and/or Facial Recognition with the use of the fingerprints and/or facial likenesses of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

105.    Although I do not know which of a given user's fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Fingerprint Recognition-enabled device via the fingerprints on thumbs or index fingers.  In the event that law enforcement is unable to unlock the device(s) found in the premises to be searched as described above within the number of attempts permitted by Fingerprint Recognition, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

106.    Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the premise to be searched to the Fingerprint Recognition sensor of device(s) found at the premises to be searched, as well as to expose the facial likenesses of individuals found at the premises to be searched to the cameras of the device(s) recovered at the premises, for the purpose of attempting to unlock the device via Fingerprint Recognition and/or Facial Recognition in order to search the contents as authorized by this warrant.

CONCLUSION

For the reasons above, I respectfully submit that there is probable cause to believe that Brett A. Amendola is engaged in wire fraud, in violation of 18 U.S.C. § 1343, among other crimes, and that evidence and instrumentalities of these violations, that is, the items listed in Attachment B, will be found in Amendola's residence,          Crescent Point Place, Ashburn, Virginia, as further described in Attachment A.

I certify that the information contained in this affidavit is true to the best of my knowledge, information, and belief.

Javier A. Gonzalez
Special Agent
Federal Bureau of Investigation

Submitted and attested to in accordance with the requirements
of Fed. R. Crim. P. 4.1 via telephone this 5th day of August, 2020.

HON. IVAN D. DAVIS
United States Magistrate Judge